*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0067p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

EDWARD DROGOSCH,

            *Plaintiff-Appellee,*

      *v.*

                 No. 08-1249

TIMOTHY METCALF,

            *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 05-60071—John Corbett O'Meara, District Judge.

Argued: December 11, 2008

Decided and Filed: February 25, 2009

Before: MARTIN and GILMAN, Circuit Judges; CARR, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Kevin R. Himebaugh, OFFICE OF THE MICHIGAN ATTORNEY
GENERAL, Lansing, Michigan, for Appellant. Ben M. Gonek, LAW OFFICE, Detroit,
Michigan, for Appellee. **ON BRIEF:** Cori E. Barkman, OFFICE OF THE MICHIGAN
ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Ben M. Gonek, LAW
OFFICE, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Timothy Metcalf, a parole agent with
the Michigan Department of Corrections (MDOC), placed Edward Drogosch under
arrest based on the mistaken belief that Drogosch had violated the terms of his probation.

_____

[*]The Honorable James G. Carr, Chief United States District Judge for the Northern District of
Ohio, sitting by designation.

Because Metcalf did not have the proper type of paperwork with him to place Drogosch in the custody of the Wayne County Jail as a probation violator, Metcalf decided to lodge Drogosch in the jail using a type of form that identified him as a *parole* violator—a class of prisoners that Metcalf knew would not be entitled to a prompt probable-cause hearing before a judge. As a result, Drogosch lingered in jail for 13 days before being released.

Drogosch subsequently sued Agent Metcalf and several other defendants pursuant to 42 U.S.C. § 1983, claiming that his constitutional rights were violated by the defendants' unlawful search and arrest, as well their failure to present him to a judge promptly following the arrest. Metcalf now appeals the district court's denial of his motion for summary judgment that he had sought on the basis of qualified immunity. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## II.  BACKGROUND

### A.     Factual background

#### 1.     *Drogosch's probation*

Drogosch had his first contact with the criminal justice system in 2003, when he was charged in state court with three counts of third-degree criminal sexual conduct. He was then 44 years old. Drogosch entered into a plea agreement to resolve the case. Under the terms of that agreement, he pled guilty to a single charge of second-degree criminal sexual conduct. The rest of the charges against him were then dropped. An additional condition of the agreement provided that Drogosch's guilty plea was to be taken under advisement, so that the case would be dismissed in its entirety if he successfully completed one year of probation.

Between the judge's acceptance of the plea and the scheduled sentencing hearing, Drogosch met with John Lazarski, a probation officer with the MDOC. Lazarski prepared a Pre-Sentence Investigation Report that erroneously stated that the victim of Drogosch's offense was a minor child. The victim was in fact 46 years old at the time of the offense.

In May 2004, Drogosch was sentenced to one year of probation. The terms of the probation order required that he attend Alcoholics Anonymous at the discretion of his probation officer, who was Lazarski. Drogosch was not, however, required to refrain from drinking alcohol. Nor was he required to register as a sex offender. Because the plea was taken "under advisement," Drogosch was not technically convicted of any crime, and he was therefore not disqualified from owning a firearm.

### 2.     *Operation SPOTCHECK/Drogosch's arrest*

The MDOC and the Wayne County Sheriff's Department set up a joint initiative in 2004 called Operation SPOTCHECK with the goal of reducing crime by randomly inspecting the homes of over 20,000 active parolees and probationers. In late October 2004, SPOTCHECK team members performed a series of unannounced checks on sex offenders. Officer Lazarski submitted Drogosch's name to his supervisor as a candidate for a home inspection as part of this sweep. As a result, SPOTCHECK team members were given a printout listing Drogosch as an individual to visit.

On October 29, 2004, Agent Metcalf, along with two other SPOTCHECK team members, arrived at Drogosch's home in Livonia, Michigan. The agents were under the impression, based on the printout that they had been given, that Drogosch's victim was between 13 and 15 years old at the time of the offense. Drogosch opened the door after one of the agents knocked. He had bloodshot eyes, slurred speech, poor dexterity, and a strong odor of alcohol on his breath.

The agents entered the home without any objection by Drogosch. Once inside, one of the agents accused Drogosch of drinking. He replied that he had consumed about five beers that evening. Drogosch then walked down the hall to let his wife know that the police were in their home. The agents followed behind him and noticed a computer in the den. They asked Drogosch's wife to turn it on. She complied, and one of the agents briefly checked the computer, presumably for pornography. The agent found nothing. Metcalf then asked Drogosch if there were any weapons in the house. Drogosch answered that he had an unloaded pistol in the bottom drawer of his dresser. Metcalf retrieved the gun from a case in the dresser, observing that it was in fact

unloaded and had a trigger lock.  The case also contained registration and safety-inspection forms for the pistol.

Drogosch attempted to explain the terms of his probation to the agents.  He brought out two documents—his Order of Probation and Conditions of Probation—that listed all of the restrictions and requirements associated with his probation.  The agents declined to look at the documents, simply stating "this doesn't mean anything."  Drogosch's wife also attempted to explain that Drogosch was allowed to drink alcohol and own a gun under the terms of his probation, but to no avail.

Based on Drogosch's apparent intoxication and possession of a firearm, the agents concluded that he was in violation of his probation.  They briefly debated among themselves whether they could take Drogosch's gun without taking him into custody, but ultimately decided that they must make an arrest.  While Drogosch was being arrested, his wife repeated two or three times: "I'm sorry I befriended her."  Agent Metcalf assumed that she was referring to the victim of Drogosch's offense.

The agents transported Drogosch to the Wayne County Jail.  Jail policy required that an appropriate detainer form be submitted before the jail would house Drogosch.  One of the agents filled out a SWIFT detainer form, which indicated on its face that Drogosch was a probationer.  A SWIFT detainer is a mechanism used by the Wayne County Sheriff's Department to temporarily hold fugitives or absconders and detain them in jail until a more formal detainer is completed.  But the desk attendant refused to accept Drogosch for incarceration under the SWIFT detainer form, instead insisting that Drogosch could be held only in connection with an MDOC-generated form.  The MDOC, however, did not have a specific form for lodging probationers in jail, despite the SPOTCHECK operating procedures requiring that the arresting agent fill out any necessary detainers following a probationer's arrest.

Agent Metcalf finally decided to complete and submit a *parole* detainer form, the only form that he had available, in order to lodge Drogosch in the jail.  Drogosch was not, and never had been, on parole.  Metcalf knew this.  Moreover, Metcalf was aware that a detained parolee, unlike a detained probationer, was not entitled to an immediate

hearing before a judge. He nonetheless decided to submit a form that misrepresented Drogosch's status so as to ensure that Drogosch would be jailed. Metcalf testified that he did so because Drogosch appeared to be drunk and Metcalf was concerned that Drogosch would do something to harm either his wife or the crime victim if not incarcerated.

Drogosch's arrest took place on a Friday night. Agent Metcalf made an entry that night in Drogosch's electronic probation file on the MDOC computer system, noting that Drogosch had been arrested and lodged in the Wayne County Jail. But Metcalf waited until the following Monday, November 1, 2004, to call Lazarski, the probation officer, to inform him that Drogosch had been taken into custody. Lazarski apparently did not know at the time that Metcalf had used an inapplicable parole detainer form to lodge Drogosch in the jail. After the telephone conversation, Lazarski prepared an Order to Show Cause against Drogosch and sent it to the county court. He took no further action until November 9, 2004. In the meantime, Drogosch lingered in jail.

Agent Metcalf did not hear anything further regarding Drogosch until he received word from Officer Lazarski on November 10, 2004 that the judge on duty had ordered Drogosch released from jail. Lazarski told Metcalf, with some urgency in his voice, something along the lines of "Judge Edwards wanted him out and he wanted him out yesterday." Metcalf then called the jail to tell them to prepare Drogosch for release, and he obtained a "Parole Detainer Removal Form." But when Metcalf and Drogosch attempted to leave the jail, the staff at the jail refused to release Drogosch because he was listed as having a November 12 court date. Drogosch was finally released the next day, November 11, 2004, after a judge issued an order of discharge.

**B.     Procedural background**

In April 2005, Drogosch filed a federal lawsuit pursuant to 42 U.S.C. § 1983 against Agent Metcalf, Officer Lazarski, the other arresting agents, Wayne County, and two other county officials. The district court eventually dismissed Drogosch's claims against all of the defendants except for Metcalf. It specifically found that the agents' arrest of Drogosch was valid because they reasonably believed that Drogosch was

violating the conditions of his probation, and the court accordingly dismissed the unlawful search and arrest claims against Metcalf on the basis of qualified immunity. But the court denied summary judgment on the claim that Metcalf had failed to promptly bring Drogosch before a judge after the arrest. It concluded that a genuine issue of material fact existed regarding whether Metcalf's action in filing the parolee-detainer form, and thereby failing to promptly present Drogosch to a judge following the arrest, was reasonable under the circumstances. Metcalf later filed a motion for reconsideration, which the court denied.

## II. ANALYSIS

### A.        Framework for qualified-immunity analysis

Section 1983 provides a cause of action to those deprived of a constitutional right by law enforcement officers acting under the color of state law. *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000). A law enforcement officer's key defense to a § 1983 action is encapsulated in the concept of qualified immunity. Analysis of the qualified-immunity defense generally proceeds under the two-step, sequential inquiry articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The threshold question that the court must address is whether, "in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right[.]" *Id.*; *see also Charvat v. E. Oh. Reg'l Wastewater Auth.*, 246 F.3d 607, 616 (6th Cir. 2001) ("First, the court must ask whether the plaintiff in the civil action has demonstrated the violation of a constitutionally protected right."). Evaluating the defense of qualified immunity on a motion for summary judgment requires that the court "adopt[] . . . the plaintiff's version of the facts." *Scott v. Harris*, 127 S. Ct. 1769, 1775 (2007). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

"On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly

established." *Id.*; *see Charvat*, 246 F.3d at 616 (explaining that the court must determine "whether the right is so 'clearly established' that a reasonable official would understand that what he is doing violates that right") (citation and internal quotation marks omitted). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." *Saucier*, 533 U.S. at 201. A third consideration occasionally examined by this court to "increase the clarity" of the analysis is "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005) (citation omitted).

**B.    Violation of a constitutional right**

Drogosch alleges that his detention following a warrantless arrest violated the Fourth Amendment's prohibition against unlawful seizures. The Supreme Court has held that individuals arrested and detained without a warrant are entitled to a "prompt" judicial determination of probable cause. *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975). "The consequences of prolonged detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships." *Id.* at 114. Failing to conduct a prompt probable-cause hearing following a warrantless arrest constitutes a violation of the Fourth Amendment's shield against unreasonable seizures. *Powell v. Nev.*, 511 U.S. 79, 80 (1994). "Prompt" generally means within 48 hours of the warrantless arrest. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). Here, Drogosch's 13-day confinement without a hearing after a warrantless arrest plainly constituted a violation of his Fourth Amendment rights.

Drogosch also asserts that his imprisonment without a hearing ran afoul of the Due Process Clause of the Fourteenth Amendment, which protects against improper use of the "formal constraints imposed by the criminal process." *Board of Regents v. Roth*, 408 U.S. 564, 572 (1972). But it is the Fourth, rather than the Fourteenth, Amendment that applies to this case because "the Fourth Amendment governs the period of

confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made, while due process regulates the period of confinement after the initial determination of probable cause." *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992).  Because Drogosch was never provided with an initial determination of probable cause, we conclude that the Fourth Amendment governs the rights at stake in the present case.

Agent Metcalf argues, however, that even if Drogosch's constitutional rights were violated,  Drogosch's claim against him fails the first prong of the qualified-immunity test because Metcalf had no legal obligation to physically bring Drogosch before a judge for a probation-violation hearing.  Metcalf essentially contends that "someone screwed up, but it wasn't me."  According to Metcalf, his responsibility was limited to informing the assigned probation officer, Lazarski, of the arrest, which he did by documenting Drogosch's electronic file and calling Lazarski the next business day following the arrest.  Metcalf reasons that it was Lazarski's responsibility to ensure that Drogosch received a prompt probable-cause hearing, and the responsibility of the jail deputies to physically bring him before a judge.

We "must look to state law to determine who is responsible for ensuring that a judicial determination of probable cause is made within 48 hours after an arrest." *Cherrington v. Skeeter*, 344 F.3d 631, 644 (6th Cir. 2003).  Michigan criminal law provides that

> [a] peace officer who has arrested a person for an offense without a warrant shall without unnecessary delay take the person arrested before a magistrate of the judicial district in which the offense is charged to have been committed, and shall present to the magistrate a complaint stating the charge against the person arrested.

Mich. Comp. Laws § 764.13.   State law thus indicates that Metcalf bore the responsibility as a "peace officer who . . . arrested a person . . . without a warrant" to take Drogosch before a magistrate.  *Id.*

And even if Agent Metcalf was not technically responsible for bringing Drogosch before a judge for a prompt hearing, his argument regarding the first qualified-immunity

prong still fails. Based on Drogosch's version of the facts, Metcalf's decision to imprison Drogosch using an inapplicable detainer form was the root cause of the constitutional violation. Drogosch would have automatically been given a prompt hearing under established procedures had Metcalf properly classified him as a probationer. Instead, by falsely characterizing Drogosch as a parolee, Metcalf ensured that Drogosch would essentially be lost in the system. Drogosch has thus satisfied the first prong of the qualified-immunity analysis.

## C.     Clearly established right

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This court has held that the decision of the Supreme Court in *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991), which predated Drogosch's arrest by more than a decade, would have alerted a reasonable official to (i) the existence of the Fourth Amendment right to a judicial determination of probable cause within 48 hours, and (ii) the unavailability of any "intervening weekend or holiday" exception to the 48-hour rule. *Cherrington*, 344 F.3d at 644. Drogosch has accordingly satisfied the "clearly established" prong of the qualified-immunity analysis.

## D.     The objective reasonableness of Agent Metcalf's actions

Finally, we consider whether Agent Metcalf's actions were objectively reasonable in light of Drogosch's clearly established rights. *See Estate of Carter*, 408 F.3d at 311 n.2. Metcalf argues that he chose the better of two bad options: (1) filling out the incorrect detainer form, or (2) "allow[ing] an intoxicated, gun possessing, sex offender [to] return to his home where he could possibly access his crime victim." He also urges us to recognize "'that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving' and the reasonableness of a particular action is to be judged from the perspective of a reasonable

officer on the scene and not with the benefit of 20/20 hindsight." (*Quoting Dorsey v. Barber*, 517 F.3d 389, 399 (6th Cir. 2008)).

Agent Metcalf's arguments on objective reasonableness ring hollow. As an initial matter, law enforcement officers are indeed occasionally called upon to make split-second decisions in the heat of the moment that, looking back, might not have been ideal. But Metcalf's act of imprisoning Drogosch involved nothing like split-second decisionmaking. It instead dealt with the far more mundane matter of which jailhouse form to complete. Metcalf had plenty of time to ponder the decision of whether to lodge Drogosch in the jail using the incorrect detainer form. Thus, in assessing the reasonableness of Metcalf's actions, we find no basis to accord him the same benefit of the doubt as we would to actions taken in "heat of the moment" situations such as the arrest of a violently resisting suspect.

Agent Metcalf's alternative argument that he chose the better of two bad options in having Drogosch imprisoned is superficially appealing, but also fails upon closer examination. Because the agents had already seized Drogosch's firearm at the time of the arrest, the only factors on which Metcalf could have based his decision that Drogosch was too dangerous to release were that Drogosch (a) had been drinking alcohol at home with his wife, (b) had a criminal record, and (c) received several apologies from his wife for befriending some unidentified woman.

These three factors simply do not justify Agent Metcalf's decision to lodge Drogosch in jail as a parole violator, which ensured that Drogosch would not receive a prompt probable-cause hearing. Drogosch admitted that he had consumed "five or six beers" before the agents' arrival. Based on the strong smell of alcohol, slurred speech, and other signs consistent with alcohol intoxication, Metcalf at best could have reasonably concluded that Drogosch had been drinking.

But Agent Metcalf would have known that Drogosch was not in violation of his probation and was not even a felon if he had bothered to look at the probation paperwork that Drogosch tried to show him before the arrest. Even if Metcalf did not have time to go over Drogosch's paperwork during the arrest, he would certainly have had time to

examine the forms on the way to the jail or during the period at the jail when he was deciding what to do about the need for a proper detainer form. Metcalf simply showed no interest whatsoever in examining Drogosch's probation paperwork.

In addition, Agent Metcalf's fear that Drogosch would pose a threat to his wife or his past victim if released was based on nothing more than pure speculation. The wife's comments to Drogosch that she was "sorry she befriended her"—which Metcalf took to relate to the victim of Drogosch's crime—were a somewhat understandable response to the inexplicable scene unfolding before her eyes. Nothing about those comments or any other evidence in the record shows that Drogosch was angry with or likely to act in a threatening manner towards his wife, or that she was fearful of him. Likewise, Metcalf's belief that Drogosch's former victim would have been endangered if Drogosch was not imprisoned had no basis in fact. Metcalf knew of no evidence that Drogosch had ever attempted to contact his crime victim after the date of the original offense. And Drogosch gave no indication that he was likely to do so if he had been released by the agents.

In sum, Drogosch has carried his burden of demonstrating that a genuine issue of material fact exists as to whether Agent Metcalf violated Drogosch's clearly established Fourth Amendment right to a prompt judicial determination of probable cause following his warrantless arrest. The district court's denial of qualified immunity to Metcalf was therefore free of error.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.