*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0352p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

WILLIAM HARRIS, JR.,

        *Plaintiff-Appellee,*

    *v.*

CITY OF CIRCLEVILLE, *et al.*,

        *Defendants-Appellants.*

No. 08-3252

> Appeal from the United States District Court
> for the Southern District of Ohio at Columbus.
> No. 04-01051—John D. Holschuh, District Judge.

Argued: March 13, 2009

Decided and Filed: October 2, 2009

Before: BATCHELDER, Chief Judge; CLAY, Circuit Judge; COX, District Judge.[*]

_____

## COUNSEL

**ARGUED:** John T. McLandrich, MAZANEC, RASKIN, RYDER & KELLER CO., L.P.A., Cleveland, Ohio, for Appellants. Charles H. Cooper, Jr., COOPER & ELLIOTT, LLC, Columbus, Ohio, for Appellee. **ON BRIEF:** John T. McLandrich, Frank H. Scialdone, MAZANEC, RASKIN, RYDER & KELLER CO., L.P.A., Cleveland, Ohio, for Appellants. Charles H. Cooper, Jr., John C. Camillus, COOPER & ELLIOTT, LLC, Columbus, Ohio, for Appellee.

    COX, D. J., delivered the opinion of the court, in which BATCHELDER, C. J., joined. CLAY, J. (pp. 20-25), delivered a separate concurring opinion.

_____
[*]The Honorable Sean F. Cox, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

---

**OPINION**

---

COX, District Judge.  Plaintiff William R. Harris, Jr. ("Harris") filed state law claims and claims under 42 U.S.C. § 1983 alleging that he was subjected to excessive force and inadequate medical care, and discriminated against on account of his race, in violation of his constitutional rights, while being booked at the Circleville City Jail on April 3, 2004.  The issue before this Court is whether the district court properly denied the Defendant-Officers' motion for summary judgment as to Harris's excessive force, deliberate indifference to serious medical needs, equal protection and assault and battery claims.  For the reasons that follow, we **AFFIRM** the district court's judgment.

I.

On April 3, 2004, Ohio State Highway Patrol Trooper Helen McManes stopped Harris, an African-American, for speeding in Pickaway County, Ohio.  Harris's fiancee at the time, now his wife, was following his car.

When speaking with Harris, Trooper McManes smelled the odor of alcohol.  She administered some field sobriety tests and ultimately administered a breathalyzer test.  Trooper McManes told Harris that although he was close to the legal limit she was not going to charge him with a DUI, but that she was going to issue him a speeding ticket.  Harris then went and sat in his wife's car and waited for his speeding ticket.

While he was waiting for his ticket, however, Trooper R.A. Cooper arrived at the scene.  Trooper Cooper approached Harris and told him he was being charged with a DUI.  He also told Harris that there was a "misdemeanor warrant out of Reynoldsburg Mayor's Court" outstanding for him.  Thus, Harris was informed that the Troopers were arresting him for DUI, speeding and the outstanding warrant.

Harris acknowledges that he was upset about being arrested and that he cursed at the Troopers. Trooper McManes handcuffed Harris and placed him in her vehicle for transport to the Circleville City Jail.

Police officers Glenn R. Williams, Phillip Roar, and Robert Gaines (collectively "Defendants" or "the Officers") were on duty at the Circleville City Jail when Harris arrived with Troopers McManes and Cooper.

Surveillance cameras at the Circleville City Jail captured some of the events and the videotape is part of the record. The events that occurred inside Cell No. 3 were outside of the view of the cameras. The area just outside of Cell No. 3, however, was within view of a camera.

Once inside the jail, Officer Williams directed that Harris be taken directly to Cell No. 3, also known as the "drunk tank." In the cell, the Officers began the booking process by attempting to take Harris's jewelry and belt from him. Harris testified that one of the Officers yanked at a necklace Harris was wearing using a ball point pen, prompting Harris to say, "Man, you don't even have to do that" and step back. (JA at 89, 703-05). One of the Officers then kicked Harris's leg out from under him and pushed him in the back, causing him to fall and hit the left side of his head. The Officers said nothing to Harris before taking him to the ground. The next thing Harris knew was that he was being lifted back on to his feet and the Officers then walked him out of the cell backwards, back into the booking area.

The videotape shows the Officers walking Harris back into the booking area. In addition to the Officers, Troopers McManes and Cooper were also present and are shown on the videotape.

Harris testified that as they were walking, he was still handcuffed and one of the Officers was "jacking my hands over my head." (JA at 709). That is, an Officer was lifting up on Harris's hands behind his back. He states that there was an Officer on each side of him, and that Officer Williams instructed him to "kneel down." Harris claims

that he could not comply with this instruction because he was handcuffed and one of the Officers was pulling his arms up behind him.

When Harris did not comply with the instruction to kneel, the Officers used a "takedown" maneuver to get Harris down on the floor. Officer Gaines, who was behind Harris at the time, struck Harris in the back of the knee, in an attempt to get his knee to buckle. Officer Roar administered two peroneal strikes to the left side of Harris's leg.

Officer Williams testified that when Harris was told to kneel down, Harris was just standing there. In other words, other than not complying with the command to kneel down, Harris was not doing anything to resist. In addition, Harris does not appear to be resisting on the videotape.

Harris testified that the strikes by the Officers caused all three of them to go down to the ground:

> Okay. When I go down, when they take me down to the ground, I felt a knee on my left side in my back, a knee on the right side in my back. My arms are being pushed up by both officers, up over my head backwards. At the same time I felt a hand on my forehead, and I'm down on the ground, and then I heard pop, pop, pop and that's when I started screaming.

(JA at 711). Harris screamed out in pain and cried "you broke my neck" to the Officers. He also told the Officers to stop shocking him[1] because it felt like electricity was running through his arms and legs and he could not move. Harris told the Officers, "I can't move. I can't move. I think y'all did something. I can't move." (JA at 716).

The Officers ignored his statements and, after removing Harris's jewelry and belt, told him to stand up. When Harris continued telling them that he could not move, the Officers removed his shirt and pants, leaving Harris in his t-shirt, underwear and socks, and literally dragged him back into Cell No. 3. When the Officers left him in the jail cell at 10:18 p.m., Harris was still yelling "Help. Help. I can't move. I can't move."

---

[1] On the videotape, Harris is heard asking the Officers to stop shocking him several times, and one or more of the Officers can be heard telling him that no one is shocking him.

Harris continued to cry out in pain after the Officers left him in Cell No. 3.  He testified as follows:

> Q.    So the officers leave and you continue to moan and groan in the cell; is that fair?
> A.    Yes, sir.
> Q.    And then at some point in time someone comes and checks on you?
> A.    Well, even – I wouldn't say check on me.  You know, I'm laying there in pain, I can't move, I'm hollering and screaming, "I need help.  Somebody help me.  Help."  I could hear people out in the hallway walking by and I'm still there screaming "Help.  I can't move."
>
>          Now, the feeling, man, I thought I was going to die right there because I had trouble breathing.  I couldn't breathe.  I couldn't move.  The electric shocks is still going up and down my body, through my hands, through my legs.  And then the door opens and it was this – another officer came in and told me to get up.  I'm still telling him "I can't move.  I can't move."  So he said, "Yes, you can," and he kicked me in my left side of my ribs.  I was telling him – I'm screaming, that part you can hear on the tape, No. Stop."
>          . . . .
>          And at this time after he kicks me he said, "Looks like we got us a broke nigger here."  And he looked at me and then he just walked out . . . .

(JA at 97-98, 718-19).  In addition, at some point while Harris was in Cell No. 3,[2] Trooper McManes approached the cell and, via the opening in the cell door, read the "BMV 2255" to Harris.[3]  Harris was lying on the cell floor  when this occurred.  Harris testified that, while Trooper McManes was at his cell,  he continued "hollering 'Help me. Help me.'"  (JA at 99).

Patricia Rice ("Rice") is a civilian employee who was working at the jail that night.  Rice testified that after the Officers took Harris to the ground they "drug him like an animal into the jail cell" and left him lying there, with Harris "screaming the whole

---

[2]Harris testified that this occurred either before or after the Officer entered his cell and kicked him.

[3]McManes can be seen doing this on the videotape.

time, 'You broke my back, you broke my back,' and they totally ignored him." (JA at 560, 565). She testified that Harris's screams continued after he was left in the cell, that the screaming was fairly constant, and that it clearly indicated he was in pain. Rice testified that Harris's screams, including his screams that his back was broken and that he could not move, could clearly be heard in the communications center – yet she did not see anyone check on Harris. Rice ultimately entered the control center and asked the Officers to check on Harris:

> I went in and I told them, I told the people that was in the communication office, and I believe I directed it to Corporal Kinser – I don't remember. There was several people in there, the officers that were involved or whatever – that he had not moved since they had put him in the cell and that – I don't know if I told them they needed to call someone or if I just went in and said "You need to check on him. He hasn't moved since you put him in the cell." And it was at that point they called the squad.

(JA at 569). Rice testified that the population of Circleville is "primarily white," estimating that only two to five percent of detainees at the jail are African-American. (JA at 50-51).

When Corporal Stephanie Kinser checked on Harris, she heard him request medical attention, say that his back was broken, and say, "Help; I can't move." She then contacted the sergeant on duty, Sergeant Barton. When Sergeant Barton arrived and saw Harris, he requested an ambulance at 11:39 p.m.

After EMS arrived and examined Harris, they transported him to a local hospital.[4] Harris later was transferred by helicopter to Grant Medical Center, where tests determined that Harris had sustained a spinal cord injury. At that time, Harris learned for the first time that he had been born with a congenital stenosis – a narrowing of the spinal canal. Harris underwent surgery three days later.

Harris filed suit against the City of Circleville ("the City"), and Officers Williams, Gaines, and Roar,[5] alleging violations of 42 U.S.C. § 1983, in addition to

---

[4] The videotape reflects that McManes remained at the jail until Harris left the jail with the EMS.

[5] Other defendants also were named but were dismissed voluntarily.

various state law claims. Following discovery, the parties filed motions for summary judgment. Harris filed a motion seeking partial summary judgment on his § 1983 claim of deliberate indifference to serious medical needs. The City and the Officers moved for summary judgment as to all claims asserted against them.

On January 23, 2008, the district court issued a "Memorandum Opinion & Order" denying Harris's Motion for Partial Summary Judgment and granting in part, and denying in part, Defendants' Motion for Summary Judgment.

With respect to Harris's excessive force claims, the district court concluded that they were to be analyzed under the Fourth Amendment's objective reasonableness standard because Harris was in the joint custody of Troopers McManes and Cooper (the arresting officers) and Defendants (the booking officers) when the incidents occurred. In making that determination, the district court noted that: 1) throughout the incidents in question, Harris was restrained by handcuffs placed on him by the Troopers; 2) the Troopers remained at the jail for over an hour after his arrest; 3) Trooper McManes interacted with Harris in the jail cell when she read the BMV's administrative license suspension form to him; and 4) Trooper McManes remained at the jail until Harris was taken to the hospital.

The district court then analyzed the three incidents of alleged excessive force and concluded, with respect to all three incidents, that: 1) a reasonable jury could conclude that the Officers' conduct was not objectively reasonable, and therefore a constitutional violation occurred; and 2) the law was clearly established. The district court therefore ruled that the Officers were not entitled to qualified immunity with respect to the excessive force claims.

The district court then analyzed the §1983 claims against the Officers involving their alleged deliberate indifference to Harris's serious medical needs. It found that the objective component was satisfied because it would have been obvious to any layperson that Harris needed prompt medical attention and that no reasonable jury could find otherwise. With respect to the subjective component, the district court found that genuine issues of material fact existed such that a reasonable jury could find in favor of

Harris or the Officers. It therefore denied Harris's request for summary judgment on this claim. The district court also ruled that the Officers were not entitled to qualified immunity because, viewing the evidence in the light most favorable to Harris, his constitutional rights were violated when the Officers failed to seek timely medical assistance and that right was clearly established at the time the incident occurred.

The district court granted the City's request for summary judgment on Harris's § 1983 claim against the City based on *Monell v. New York Dept. of Social Services*, 436 U.S. 658 (1978).

The district court denied the Officers' request for summary judgment with respect to Harris's equal protection claim. The Officers claimed to be entitled to summary judgment on this claim on the ground that Harris produced no evidence that the Officers' actions were motivated by racial bias. The district court disagreed and concluded that a reasonable jury could find that, because of a racial animus, the Officers used excessive force and were deliberately indifferent to Harris's serious medical needs.

The district court denied the Officers' request for summary judgment as to Harris's assault and battery claim. The Officers had sought summary judgment on the ground that they are statutorily immune under Ohio Revised Code § 2744.03(A)(6). The district court found that there was an issue of fact as to whether the Officers acted with malice, or in a wanton or reckless manner. Thus, it concluded that there was an issue of fact as to whether an exception to statutory immunity applied.

Finally, the district court granted the Officers summary judgment on Harris's claim for intentional infliction of emotional distress, based on statutory immunity.

Thereafter, the Officers filed this interlocutory appeal.

## II.

As an initial matter, we address whether we have jurisdiction over this interlocutory appeal. Title 28 U.S.C. § 1291 limits appellate jurisdiction to "final decisions of the district courts." A district court's denial of qualified immunity is a final

decision for purposes of § 1291 only to the extent that it turns on an issue of law. *Kirby v. Duva*, 530 F.3d 475, 480 (6th Cir. 2008); *Livermore v. Lubelan*, 476 F.3d 397, 402 (6th Cir. 2007). "Consequently, this court cannot hear an interlocutory appeal challenging 'a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a genuine issue of fact for trial.'" *Kirby,* 530 F.3d at 480-81 (quoting *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995)). The Court, however, retains jurisdiction over the legal question of qualified immunity, *i.e*., whether a given set of facts violates clearly established law. *Id.* To the extent that Defendants make such arguments, there is jurisdiction over their interlocutory appeal.

To the extent that Defendants challenge the accuracy of Harris's factual statements, however, this Court is without jurisdiction. *Kirby,* 530 F.3d at 481. "A defendant who files an interlocutory appeal after the denial of qualified immunity 'is required to limit [his] argument to questions of law premised on facts taken in the light most favorable to the plaintiff.'" *Id.* (quoting *Meals v. City of Memphis*, 493 F.3d 720, 726-27 (6th Cir. 2007)). That the Defendants here "make the occasional factual argument" does not, however, destroy jurisdiction over the legal issues presented. *Id.* This court may simply ignore Defendants' attempts to dispute plaintiffs' version of the facts, obviating the need to dismiss the entire appeal for lack of jurisdiction. *Id*.

## III.

When no facts are in dispute, whether an official receives qualified immunity is a question of law. *Champion v. Outlook Nashville, Inc*., 380 F.3d 893, 900 (6th Cir. 2004). We review the district court's denial of summary judgment *de novo*. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc). Summary judgment is warranted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In considering a motion for summary judgment, we view the factual evidence and draw all reasonable inferences in favor of the non-moving party. *Williams*, 186 F.3d at 689.

IV.

Defendants' first argument on appeal is that the district court erred in denying their Motion for Summary Judgment because they are entitled to qualified immunity from Harris's excessive force claims, brought under § 1983.

To state a claim under § 1983, a plaintiff must set forth facts that, when construed favorably, establish: 1) the deprivation of a right secured by the Constitution or laws of the United States; 2) caused by a person acting under the color of state law. *Dominguez v. Correctional Medical Services,* 555 F.3d 543, 549 (6th Cir. 2009). Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.; Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008).

Determining whether government officials are entitled to qualified immunity generally requires two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation*. Dominguez*, 555 F.3d at 549.

The Officers assert that the Fourteenth Amendment's "shocks the conscience" standard is the appropriate standard under which to analyze Harris's excessive force claims. Harris urged the district court to apply the Fourth Amendment's "reasonableness" standard.

On appeal, Harris asserts that when the facts are viewed in the light most favorable to him, a constitutional violation occurred under either standard. We agree.

The "standards of liability vary significantly according to which amendment applies." *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002). "A substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment than under the 'objective reasonableness' test of *Graham*, in which excessive force can be found if the officer's actions, in light of the totality of the

circumstances, were not objectively reasonable." *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001).

"The substantive component of Fourteenth Amendment due process protects citizens against conduct by law enforcement officers that 'shocks the conscience.'" *United States v. Budd*, 496 F.3d 517, 529 (6th Cir. 2007) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). This circuit has held that the Due Process Clause protects a pretrial detainee from "excessive force that amounts to punishment.'" *Budd*, 496 F.3d at 530; *Phelps v. Coy*, 286 F.3d 295, 300 (6th Cir. 2002).

Defendants are not entitled to qualified immunity because we conclude that the facts taken in a light most favorable to Harris are sufficient to establish a violation of Harris's constitutional rights under either standard. Therefore, we need not decide which standard applies.

Applying a Fourth Amendment analysis to Harris's excessive force claims, it is clear that the facts, taken in a light most favorable to Harris, are sufficient to establish a violation of his constitutional rights. The "objective reasonableness standard" depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene. *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008). Relevant considerations in determining the reasonableness of force used are: 1) the severity of the crime at issue; 2) whether the suspect posed an immediate threat to the safety of the police officers or others; and 3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

In assessing the reasonableness of the Officers' actions, we analyze the events in segments. *Phelps,* 286 F.3d at 301. There are three segments: 1) the initial incident in Cell No. 3; 2) the takedown maneuver in the booking area; and 3) the kicking incident in Cell No. 3. Considering the relevant factors, with respect to each of these three segments, Harris's version of the events supports a holding that Defendants violated Harris's Fourth Amendment right to be free from excessive force.

Under Harris's version of the facts, in the first segment, the Officers began the booking process by attempting to take Harris's jewelry and belt from him. When one of the Officers yanked at a necklace he was wearing using a ball point pen, Harris said, "Man, you don't even have to do that" and stepped back. The Officer then kicked Harris's leg out from under him and pushed him in the back, causing him to fall and hit his head. The Officers said nothing to Harris before taking him to the ground.

In the second segment, as the three Officers were walking Harris back into the booking area he was still handcuffed and one of the Officers was lifting up on his hands behind his back. There was an officer on each side of Harris when Officer Williams instructed Harris to "kneel down." Harris could not comply with the instruction, however, because he was handcuffed and one of the officers was pulling his arms up behind him. When Harris did not comply with the instructions to kneel, the Officers used a "takedown" maneuver to get Harris down on the floor. Officer Gaines, who was behind Harris at the time, struck Harris in the back of the knee, in an attempt to get his knee to buckle. Officer Roar administered two peroneal strikes to the left side of Harris's leg. Harris testified that the strikes by the officers caused all three of them to go down on the ground, that he felt knees striking his back, that his arms were being pushed up by both officers over his head.

In the third and final segment, after the Officers had ignored Harris's cries for help and left him on the floor of Cell No. 3, one of the Officers entered the cell. Rather than respond to Harris's cries for help, that Officer told Harris to get up. When Harris responded that he could not move, that Officer kicked Harris in the ribs and said "Looks like we got us a broke nigger here."

We conclude that the *Graham* factors weigh against the Officers. Harris was accused of "speeding, DUI and failing to appear in mayor's court." Relatively speaking, these are not particularly serious crimes and none of them involve violence. In addition, Harris did not pose an immediate threat to the Officers or anyone else at the Circleville City Jail. It is undisputed that Harris was handcuffed during each of the incidents in question. During the first segment he was surrounded by the three Officers and during

the second segment he was surrounded by the Officers *and* Troopers McManes and Cooper. Indeed, the Officers testified that they did not feel threatened by Harris or that they were in any imminent danger from him. Finally, under Harris's version of the facts, he did not actively resist at any time.

Accordingly, these facts taken in a light most favorable to Harris are sufficient to establish a violation of his constitutional rights under a Fourth Amendment analysis.

Even if we were to apply the "shocks the conscience" test, the more difficult standard for the plaintiff to meet, we would still affirm the district court's decision denying qualified immunity to Defendants. The above facts, taken in a light most favorable to Harris, are sufficient to establish at least a genuine issue of fact as to whether Defendants applied excessive force that amounts to punishment.

Thus, regardless of the standard that applies, viewing the facts in the light most favorable to Harris, Harris has shown that a constitutional violation occurred.

Next, we must determine whether the right was clearly established at the time of the violation. For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right. *Dominguez,* 555 F.3d at 552.

Defendants contend that the law was not clearly established because the law was unclear about what standard applies to Harris's excessive force claims (i.e., the Fourth or Fourteenth Amendment). We reject that argument because even if there were some lingering ambiguity as to whether the Fourth or the Fourteenth Amendment applies in this precise context, the "legal norms" underlying Harris's claims nevertheless were clearly established.

A defendant is not entitled to summary judgment on the basis of qualified immunity simply because the courts have not "agreed upon the precise formulation of the [applicable] standard." *Saucier v. Katz*, 533 U.S. 194, 202-03 (2001). Under this circuit's existing case law, there undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has

been subdued and does not present a danger to himself or others.  *See Grawley v. Drury,* __ F.3d __ (6th Cir. May 28, 2009) ("The general consensus among our cases is that officers cannot use force . . . on a detainee who has been subdued" and "is not resisting arrest."); *see also Bultema v. Benzie County*, 146 F. App'x 28, 37 (6th Cir. 2005) (unpublished) ("when a suspect has already been restrained, the officer's constitutional authority to use force is significantly more circumscribed").  As we noted in *Bultema*, it is clearly established in this circuit that "the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional."  *Id*. at \*35. Although *Bultema* is an unpublished opinion, this Court has reached the same conclusion in a number of reported opinions.  *See, e.g., Champion v. Outlook Nashville, Inc*., 380 F.3d 295, 302 (6th Cir. 2004) (holding that "no reasonable officer would have continued to spray a chemical agent in the face of a handcuffed and hobbled . . . arrestee"); *Phelps,* 286 F.3d at 302 (holding that no reasonable officer would strike a handcuffed arrestee in the head); *Adams v. Metiva*, 31 F3d 375, 387 (6th Cir. 1994) ("A reasonable person would know that spraying mace on an . . . incapacitated person . . . would violate the right to be free from excessive force"); *McDowell,* 863 F.2d at 1307 (holding that a "totally gratuitous blow with a policeman's nightstick" to a handcuffed, unresisting suspect was constitutionally unreasonable); *Lewis v. Downs*, 774 F.2d 711, 714 (6th Cir. 1985) (holding that beating and kicking restrained suspects who are in the control of the police is "plainly excessive" force).  Thus, even if it were unclear whether the Fourth or Fourteenth Amendment governs Harris's excessive force claims, the legal norms underlying those claims were nevertheless clearly established.

Accordingly, we affirm the district court's denial of qualified immunity with respect to Harris's excessive force claims.

V.

Defendants also contend that the district court erred in denying them qualified immunity with respect to Harris's claim that they were deliberately indifferent to his serious medical needs.

For the failure to provide medical treatment to constitute a constitutional violation, Harris must show that Defendants acted with "deliberate indifference to serious medical needs." *Dominguez,* 555 F.3d at 550 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A constitutional claim for deliberate indifference contains both an objective and a subjective component. *Id.*

Here, the Officers contend that neither the objective nor the subjective components are satisfied. We disagree.

"The objective component requires a plaintiff to show the existence of a 'sufficiently serious' medical need." *Id.* A medical need is objectively serious where a plaintiff's claims arise from an injury or illness "so obvious that even a layperson would easily recognize the necessity for a doctor's attention."[6] *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897-900 (6th Cir. 2004).

Viewing the facts in the light most favorable to Harris, Harris exhibited manifestations of pain and injury that would have been obvious to a lay person. Upon taking Harris to the ground, there was an audible popping sound. Then, immediately after the takedown maneuver, Harris began crying out in pain. Harris repeatedly exclaimed, "you broke my neck" and "I can't move." He also cried out for help numerous times and repeatedly asked the Officers to "stop shocking him," although the Officers were aware that Harris was not being shocked. Rather than investigating the validity of Harris's continuous complaints and requests for help, the Officers instead dragged him into Cell No. 3 and left him face-down on the cell floor. With these facts, a jury could reasonably find that Harris had a serious need for medical care that was so obvious that even a layperson would easily recognize the need for a doctor's attention.[7] *Id.* at 899. Thus, the objective component is satisfied.

---

[6] In such situations, the "plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated. Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time." *Blackmore,* 390 F.3d at 899-900.

[7] Indeed, a layperson (Rice) *did* recognize the need for medical attention.

The subjective component "requires a plaintiff to 'allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'" *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

"Because government officials do not readily admit the subjective component of this test, it may be 'demonstrat[ed] in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Dominguez,* 555 F.3d at 550 (quoting *Terrance v. Northville Reg'l Psychiatric Hosp*., 286 F.3d 834, 843 (6th Cir. 2002)).

Viewing the facts in a light most favorable to Harris, we agree with the district court that a reasonable jury could find that the subjective component is met. Officer Williams testified that he was aware of various symptoms of a spinal cord injury, such as shocking sensations and the inability to move the extremities, and that Harris exhibited both of those symptoms. Officer Roar also acknowledged that there were indications that Harris might need medical attention. He testified that he assumed Officer Williams was going to get medical assistance, but that he cannot recall having any discussions about it. Roar further acknowledged that in a situation such as this, medical assistance should be summoned promptly.

Officer Gaines acknowledged, during his deposition, that there were indicators – such as what Harris was saying to the Officers– that Harris needed medical help. Nevertheless, he testified as follows:

> Q.    Did you ask Officer Williams or Sergeant Reams to summon medical assistance for Mr. Harris at any time?
> A.    No.
> Q.    Why not?
> A.    I don't know.  I can't answer that.  I don't know.

(JA at 130).

In addition, the Officers did not comply with stated jail policy. *See Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907, at *6 (6th Cir. Feb. 2, 2009) (noting, while analyzing subjective component, that defendant did not comply with jail policy). During his deposition, Officer Williams acknowledged that the Circleville Jail Operations Manual states that "all persons involved in use of force incidents who complain of or perceive injuries will receive medical attention as soon as possible." He also acknowledged that Harris had been involved in a use of force incident and that Harris was complaining of injury. Nevertheless, no one sought medical attention for Harris until – approximately an hour and a half after Harris exhibited symptoms of a spinal cord injury and started crying out that his back was broken – Sergeant Barton arrived and requested an ambulance.

We conclude that Harris submitted sufficient evidence for a jury to conclude that the Officers were aware of facts from which the inference could be drawn that a sufficiently serious medical need existed, and that they drew that inference. Thus, viewing the evidence in a light most favorable to Harris, he can establish a constitutional violation.

Moreover, it is beyond dispute that the right to medical treatment for a serious medical need was clearly established at the time of the incident. *See e.g., Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972).

Accordingly, we affirm the district court's denial of qualified immunity on this claim.

## VI.

Defendants also challenge the district court's denial of qualified immunity with respect to Harris's equal protection claim.

Harris's equal protection claim is set forth as Count III of Plaintiff's Third Amended Complaint. Harris alleges that, as an African-American, he is a member of a protected class and entitled to equal protection under the law. He alleges that "[d]ue in whole or in part to his membership in a protected class, defendants, who are Caucasian,

deliberately discriminated against [him] by using excessive force against him, and/or by denying him prompt medical treatment, in violation of his constitutional rights."

In their Motion for Summary Judgment, Defendants noted that under *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999), an individual bringing such a claim under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class.[8] Defendants sought summary judgment on this claim on the ground that Harris "produced no evidence to demonstrate that the use of force or alleged delay in medical treatment was in any way motivated by racial animus."

The district court concluded that Harris had presented sufficient evidence of racial animus to withstand summary judgment on this claim. The district court noted that the evidence presented by Harris included that: 1) Rice estimated that only two to five percent of detainees at the jail are African-American; 2) the Officers testified that on no previous occasions had they administered peroneal strikes to a handcuffed detainee; 3) Officer Williams could not recall any previous instance where a handcuffed detainee was struck to obtain compliance with a verbal instruction; and 4) Harris testified that while he was lying on the floor of Cell No. 3 following the takedown maneuver, screaming and stating he could not move, one of the Officers entered the cell, kicked him in the ribs and then stated "Looks like we got us a broke nigger here."

We agree that Harris has presented sufficient evidence from which a reasonable jury could conclude that Defendants used excessive force and delayed medical treatment because of Harris's race, in violation of his constitutional rights. Moreover, it was clearly established that such discriminatory conduct would be unlawful. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 545 (1979).

Accordingly, we affirm the district court's denial of qualified immunity as to Harris's equal protection claim.

---

[8]Subsequently, in *Willowbrook v. Olech*, 528 U.S. 562 (2000), the Supreme Court recognized equal protection claims brought by a "class of one" where the plaintiff alleges that he or she has been treated differently from similarly-situated individuals.

VII.

Finally, with respect to Harris's assault and battery claim, Defendants assert that the district court erred in denying immunity under OHIO REV. CODE § 2744.03.

Defendants are not entitled to such immunity if their "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." OHIO REV. CODE § 2744.03(A)(6)(b). The Ohio Supreme Court has held that "the issue of wanton misconduct is normally a jury question." *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356 (1994).

We agree with the district court that, viewing the evidence in a light most favorable to Harris, a reasonable jury could conclude that Defendant acted with a malicious purpose or in a wanton or reckless manner. Thus, we affirm the district court's ruling with respect to statutory immunity.

VIII.

We therefore **AFFIRM** the judgment of the district court.

---

**CONCURRENCE**

---

CLAY, Circuit Judge, concurring.   Although I concur in the judgment, and concur with most aspects of the majority's opinion, I write separately to clarify an important issue regarding the nature of the inquiry required in cases such as this.

As the majority explains, Defendants appeal from the district court's denial of their qualified immunity defenses.  Because the qualified immunity privilege, if it applies, entitles the Defendants to "immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), Defendants raised their immunity claims as a basis for summary judgment.  Guided by our decision in *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002), which in turn relied on *Graham v. Connor*, 490 U.S. 386, 394 (1989), the district court assumed that it was required to determine whether Harris' excessive force claims should be analyzed under the Fourth or the Fourteenth Amendment.   On appeal, Defendants challenge the district court's determination that the Fourth Amendment applies, as well as the court's conclusion that the application of the Fourth Amendment in this context was clearly established.  In rejecting the Defendants' claims, the majority correctly notes that it need not delve into whether the Fourth or Fourteenth Amendment applies in this context.

In my opinion, the district court's approach gave too much credence to Defendants' fundamentally flawed claims.  Essentially, Defendants argue that any lingering ambiguity regarding whether the Fourth or Fourteenth Amendment applies in this context implies that they are entitled to summary judgment because the rights implicated by Harris' claims could not have been "clearly established."  That entire premise is mistaken.  As the majority properly concludes in rejecting this argument, "even if there were some lingering ambiguity as to whether the Fourth or the Fourteenth Amendment applies in this precise context, the 'legal norms' underlying Harris' claims nevertheless were clearly established."  Indeed, the Supreme Court has made absolutely clear that the courts need not "have agreed upon the precise formulation of the

[applicable] standard" for a right to be "clearly established" for qualified immunity purposes:

> Assuming, for instance, that various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard.

*Saucier v. Katz*, 533 U.S.194, 202-03 (2001). Accordingly, even if it is unclear whether the Fourth or Fourteenth Amendment governs Harris' excessive force claims, Defendants are not necessarily entitled to qualified immunity.

The majority concludes, and I agree, that there "undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others." In my opinion, that is all that is necessary to reject Defendants' qualified immunity claims. Because it is clearly established that officers may not use gratuitous physical force against a criminal suspect who already has been subdued and who does not present a danger to himself or others, Defendants are not entitled to qualified immunity. That is true regardless of whether Harris' claims should be analyzed under the Fourth or the Fourteenth Amendment, and regardless of whether Harris remained in the joint custody of the arresting officers and the booking officers. The district court nevertheless tackled these questions. Although the district court will need to determine the applicable standard before instructing the jury on Harris' excessive force claims or before determining whether Harris is entitled to summary judgment on these claims, resolving that issue simply was not necessary to determine whether Defendants are entitled to summary judgment on the basis of qualified immunity.

Perhaps much of the confusion derives from our decision in *Phelps* where we explained that "[t]o decide whether [a plaintiff] presented evidence that [a police officer defendant] violated his constitutional right not to be subjected to unnecessary beating, we must first ascertain the source of that right." 286 F.3d at 299. In making that pronouncement, we relied on the Supreme Court's decision in *Graham*, where the Court

held that, "[i]n addressing an excessive force claim brought under § 1983, [our] analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." 490 U.S. at 394. The problem is that although *Graham* and *Phelps* both involved § 1983 excessive force claims, *Graham*, unlike *Phelps*, was concerned with determining the applicable standard for resolving an excessive force claim on the merits, not determining whether the Defendants are entitled to summary judgment on the basis of qualified immunity.

Although subtle, the distinction is critical. In the qualified immunity context, the courts need not determine the "specific constitutional right" at issue to resolve whether a defendant officer was sufficiently "on notice that his conduct would be clearly unlawful." *Saucier*, 533 U.S. at 202; *see Mitchell*, 472 U.S. at 528 ("An appellate court reviewing the denial of the defendant's claim of immunity need not . . . determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the *legal norms* allegedly violated by the defendant were clearly established at the time of the challenged actions . . . ." (emphasis added)). Consequently, because our case law unequivocally establishes that it is unconstitutional for police officers to gratuitously strike a restrained suspect who does not even remotely present a danger to the officers, *see Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009) ("The general consensus among our cases is that officers cannot use force . . . on a detainee who has been subdued . . . [and] is not resisting arrest."), the Defendants were sufficiently on notice that their *conduct* was unconstitutional, even if the courts "had not agreed on one verbal formulation of the controlling *standard*." *Saucier*, 533 U.S. at 203 (emphasis added).

Clarifying the appropriate inquiry is particularly important in this case. As our sister circuits have recognized, *Graham* expressly "left open the question of how to analyze a claim concerning the use of excessive force by law enforcement 'beyond the point at which arrest ends and pretrial detention begins.'" *Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir. 2000) (quoting *Graham*, 490 U.S. at 395 n.10). While this Court's more recent case law leaves no question that the Fourth Amendment applies throughout

the booking process, *see Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir. 2009), Defendants nevertheless assert that there was some question in 2004 about the application of the Fourth Amendment in this context. In confronting this question in *Lawler v. City of Taylor*, 268 F. App'x 384 (6th Cir. 2008), we held that the Fourth Amendment "applies to an officer's use of force during a booking procedure," *id*. at 386, in addressing claims arising out of events that took place in February of 2004, two months before the events at issue in this case occurred. Our decision in *Lawler*, however, relied entirely on *Phelps* for that proposition, despite the fact that *Phelps* acknowledged that it was unclear whether the Fourth Amendment applies to claims concerning conduct that takes place before completion of the booking process that do not involve the arresting officers. *See Phelps*, 286 F.3d at 302 (distinguishing our decision in *Holmes v. City of Massillon*, 78 F.3d 1041, 1049 n.6 (6th Cir. 1996), which observed that "the law of this Circuit is unclear as to whether a pretrial detainee can bring a Fourth Amendment excessive force claim or even as to when an arrestee clearly becomes a pretrial detainee"). And while *Drogosch* dictates that the Fourth Amendment applies to a suspect's excessive force claims throughout and even beyond the booking process regardless of whether the suspect remains in the custody of the arresting officers, *see* 557 F.3d at 378 (applying Fourth Amendment at least up until a detained criminal suspect who is booked into jail is given "an initial determination of probable cause"), *Drogosch* was decided in 2009 and involved events that took place in October 2004, several months *after* the relevant conduct here. Although this argument is without merit, Defendants have at least a plausible claim that the application of the Fourth Amendment was not *fully* settled as of April 2004.

Nevertheless, on my reading of the required inquiry, Defendants would not be entitled to summary judgment regardless of whether the application of the Fourth Amendment was unclear at the time, and regardless of whether Harris remained in the joint custody of the arresting officers and the booking officers. By addressing those issues, the district court wrongly implied that Defendants' premise that they would be entitled to qualified immunity if the application of the Fourth Amendment was not fully settled at the time has some credence. It does not. The district court's decision to

address this issue also perpetuates the notion that the application of the Fourth Amendment turns on whether the suspect remains in the continuing custody of the arresting officers, a premise that our decision in *Drogosch* unequivocally put to rest.

Simply put, because our case law makes clear that Defendants' conduct was unconstitutional under any standard, it is irrelevant for qualified immunity purposes whether Harris' claims are controlled by the Fourth or Fourteenth Amendment, and thus it is irrelevant whether Harris remained in the joint custody of the arresting officers and the booking officers. And, despite what we unintentionally may have suggested in *Phelps*, it is not always necessary to determine the governing legal standard to resolve a qualified immunity claim. That is especially true in this context because this circuit's case law gave the officers more than sufficient notice that criminal suspects who already have been subdued and who present no possible threat to the officers or themselves have a clearly established constitutional right not to be gratuitously struck by a police officer.

Although it may be helpful to the district court for us to clarify what standard it must apply when addressing the merits of Harris' claims, because we need not reach that constitutional question to resolve Defendants' present appeal, well-established principles counsel us to abstain from addressing the issue. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, ___ U.S. ___, 129 S. Ct. 2504, 2513 (2009) ("It is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.'" (quoting *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam)); *Pearson v. Callahan*, 555 U.S. ___, 129 S. Ct. 808, 821 (2009) (citing "the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable" (quotation and editorial marks omitted)); *United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002) ("Courts should avoid unnecessary constitutional questions."); *Bowman v. Tenn. Valley Auth.*, 744 F.2d 1207, 1211 (6th Cir. 1984) ("[W]e follow the longstanding practice of the Supreme Court . . . [in declining] to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." (quotation marks and citation omitted)); *Tower Realty v. City of East*

*Detroit*, 196 F.2d 710, 724 (6th Cir. 1952) ("It is the duty of federal courts to avoid the unnecessary decision of the constitutional questions.").