NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0237n.06

No. 12-1534

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JAMES DARNELL JACKSON, as Personal )
Representative of the Estate of Doyle M. Jackson, )
Deceased estate of Doyle M. Jackson, )
     )
     )
       Plaintiff-Appellant, )
     )
v. )   ON APPEAL FROM THE UNITED
     )   STATES DISTRICT COURT FOR
     )   THE WESTERN DISTRICT OF
JIM WILKINS, Benton Harbor Police Officer; )   MICHIGAN
DUSTIN BLASKIE, Benton Harbor Police Officer; )
AL MINGO, Benton Harbor Police Chief; L. PAUL )
BAILEY, Berrien County Sheriff; PERRY BUNDY, )
Berrien County Employee; PRESTON ALSUP, )
Berrien County Corporal, in their Official and )
Individual Capacities; CITY OF BENTON )
HARBOR, A Municipal Corporation; COUNTY OF )
BERRIEN, A Political Subdivision; BRIAN )
WILKEY, identified on initiating document as Brian )
Wilky; MARK HAUEISEN, identified on initiating )
document as Mark Houhuiser; JASON UHRICK, )
identified on initiating document as Jason Urick; )
RON UHRICK, identified on initiating document as )
Ron Urick, )
     )
       Defendants-Appellees. )

FILED
*Mar 06, 2013*
DEBORAH S. HUNT, Clerk

Before:  BATCHELDER, Chief Judge; MERRITT and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge.  Doyle Jackson collided violently with a dumpster while running from two police officers.  Although he was hurt too badly to stand up on his own, the officers left Jackson in the back seat of a patrol car for 40 minutes before taking him to jail.  Jackson died of internal bleeding a few hours later.

Jackson's Estate brought suit under § 1983, alleging that the officers used excessive force during the arrest and that various defendants were deliberately indifferent to Jackson's medical needs. The defendants moved for summary judgment on qualified-immunity grounds, which the district court granted. We affirm in part, reverse in part, and remand.

I.

Ordinarily, we view the facts in the light most favorable to the nonmoving party. *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012). But here, we have several videos that, taken together, capture most of the events in question. We therefore view the facts in the light most favorable to Jackson's Estate, unless these videos contradict the Estate's allegations. *See id.*

At 4:00 a.m. on May 29, 2007, Jackson assaulted his girlfriend, Imogene Wade, and locked her out of her house. Wade ran to a neighbor's house and called the police. Officer Dustin Blaskie responded first, followed closely by Officer Jim Wilkins. As the officers arrived, they saw Jackson pulling a car out of Wade's driveway. Blaskie heard Wade yell that Jackson was stealing her car, so he told Wilkins to stop Jackson from escaping. Wilkins pulled his car forward to block Jackson's path, but Jackson drove around him and sped off.

A brief car chase followed. After less than a minute, Jackson's vehicle crashed into a curb (totaling Wade's car in the process), and stopped in a field. Both Jackson and Wilkins then exited their vehicles. Wilkins drew his gun, pointed it at Jackson, and ordered him to get on the ground. Jackson ignored him. Instead, Jackson put his hands in the air and walked directly toward Wilkins. When Jackson was less than a step away, Wilkins stiff-armed him. Jackson stumbled backward, then turned and fled down the street.

With Blaskie and Wilkins on his heels, Jackson veered into an alley. Moments later, Blaskie pulled out his taser and shot Jackson in the back. According to the Estate's experts, the electric shock threw Jackson forward and slammed him into the metal arm of a nearby dumpster. None of the videos depict the arm itself, and none of the witnesses describe it. But the arm was thin enough, and protruded far enough, for Blaskie to say that Jackson did a "backflip" around it.

Jackson tried to get up and continue running after the collision, but the officers quickly caught him. For the next minute or two, Blaskie and Wilkins struggled to subdue Jackson. During that time, they punched, kicked, and tased him repeatedly. At first these actions had little effect on Jackson, but eventually he stopped resisting. The officers then handcuffed Jackson, left him lying on his stomach, and waited for backup.

Officer Preston Alsup, the shift commander, soon pulled up in his patrol car. As his in-car video shows, the three officers ordered Jackson to stand up. Jackson replied that he could not do so on his own. The officers ignored this reply and told him again to stand up. Jackson insisted that he could not. When the officers continued to ignore his request, Jackson pleaded with them:

> Please, help me. Please, Lord. Please, help me, Jesus. I cannot stand. I cannot stand. Oh, Lord, help me. Jesus, help me. Help me, please. Help me. Help. Help me. Oh, Lord. Oh.

At that point, Blaskie and Wilkins picked Jackson up and laid him across the back seat of Alsup's car. As they did so, both officers noticed a bruise forming on Jackson's chest (he had lost his shirt during the chase), which they concluded had come from his collision with the dumpster.

Alsup, Blaskie, and Wilkins drove separately back to the scene of Jackson's car accident, where they joined an unidentified fourth officer. For the next 15 minutes or so, Jackson remained

in Alsup's car as the four officers searched the area. They did not monitor Jackson. Then, at 4:40 a.m., Blaskie returned to his car and went back on patrol.

After Blaskie left, Alsup and Wilkins spent another 20 minutes at the accident scene with Jackson. It is unclear what the officers did during this time, though at some point they carried Jackson from Alsup's car to Wilkins's. They also discussed whether to take Jackson to the hospital. Although Alsup was responsible for making that decision, Wilkins did not tell him about Jackson's collision with the dumpster arm. Alsup ultimately decided that Jackson did not need to go to the hospital, so he told Wilkins to take Jackson to jail. All told, Jackson remained at the accident scene for approximately 40 minutes.

Wilkins and Jackson arrived at Berrien County Jail at 5:06 a.m. Four officers were present when they arrived: Ronald Urick, Jason Urick, Brian Wilkey, and Perry Bundy (the "Berrien County officers"). Wilkins told one of these officers that Jackson "had been tased and that he had some injuries." He did not tell anyone, however, that Jackson had collided with the dumpster arm. The Berrien County officers ordered Jackson out of the car, but Jackson again replied that he could not get up on his own. So the officers pulled Jackson out of the car, and carried him to a cell. As they did, Wilkins noticed that Jackson had defecated on himself. Wilkins then left.

For the next hour, officers monitored Jackson in his cell. Jackson spent most of that time rolling around on the floor, though he did manage to pull himself onto the toilet three times. Jackson continued to defecate on himself, and also vomited. At 6:13 a.m., Berrien County Nurse Mark Haueisen entered Jackson's cell to perform a medical assessment. Haueisen quickly realized that Jackson was becoming less responsive, so he called an ambulance. Jackson died at the hospital

shortly thereafter. An autopsy revealed that the cause of death was internal bleeding from a lacerated liver, which Jackson had suffered during his collision with the dumpster.

Jackson's Estate then sued everyone involved under § 1983. The Estate alleged two constitutional violations: first, that Blaskie and Wilkins used excessive force when they arrested Jackson; and second, that Alsup, Blaskie, Wilkins, the Berrien County officers, and Haueisen were deliberately indifferent to Jackson's medical needs after the application of that force. The Estate also sought to establish municipal liability against the City of Benton Harbor, Police Chief Al Mingo, Berrien County, and Sheriff L. Paul Bailey. The district court granted summary judgment on qualified-immunity grounds to all the defendants. This appeal followed.

## II.

We review de novo the district court's grant of qualified immunity. *King v. Taylor*, 694 F.3d 650, 661 (6th Cir. 2012). Jackson's Estate has the burden of proving that the defendants should not receive qualified immunity. *See Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012). To do so, the Estate must show that the defendants violated Jackson's constitutional rights, and that those rights were clearly established. *See id.*

## A.

The Estate argues that Blaskie and Wilkins used excessive force when they arrested Jackson. The Fourth Amendment permits an officer to use a reasonable amount of force when making an arrest. *See Hayden v. Green*, 640 F.3d 150, 153 (6th Cir. 2011). To determine whether an officer's use of force was reasonable, we consider three factors: "the severity of the crime at issue, whether

the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quotation marks omitted).

All three factors support the force that the officers used here. First, Jackson had apparently (and in fact) committed several serious crimes, including domestic assault, auto theft, and resisting arrest. Second, he fled from the officers twice: once in Wade's car and once on foot. Third, the officers had plenty of reason to think that Jackson "pose[d] an immediate threat to the safety of the officers or others[.]" *Id.* The officers knew that Wade had reported Jackson for domestic violence. They knew that Jackson had led them on a high-speed car chase, albeit a brief one. And they knew that, after totaling Wade's car, Jackson had ignored Wilkins's commands to get on the ground and walked directly at Wilkins instead. The officers' decision to use force was therefore reasonable.

The Estate disputes this conclusion in two ways. First, it contends that Blaskie violated "TASER rules and procedures" when he allegedly tased Jackson while Jackson was running. The Estate has not cited any cases, however, that say that tasing a running suspect is an excessive use of force. So it has not shown that Blaskie violated clearly established law. *Cf. Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) (holding that, in May 2007, the use of a taser was not a violation of clearly established law).

Second, the Estate contends that the officers used too much force after Jackson's collision with the dumpster arm, when they allegedly tased him 11 times, as well as punched and kicked him repeatedly. The Estate concedes, however, that Jackson was the "strongest" and the "most physical" person the officers had ever fought. So the officers had to use a significant amount of force to subdue him. Moreover, we give a "measure of deference to the officer's on-the-spot judgment about

-6-

the level of force necessary in light of the circumstances of the particular case." *Green*, 640 F.3d at

153 (quotation marks omitted). And the officers used less force here than we have found reasonable

elsewhere. For example, in *Williams v. Sandel*, 433 F. App'x 353, 362 (6th Cir. 2011), we held that

it was reasonable for officers to tase a suspect 37 times, in addition to using their batons and pepper

spray, because the suspect "remained unsecured and unwilling to comply with the officers' attempts

to secure him[.]" *Id.* Blaskie and Wilkins acted similarly—they stopped applying force the moment

Jackson stopped resisting them.

In sum, Jackson's Estate cannot prove to a jury that Blaskie and Wilkins used excessive force

during the arrest, or that they violated clearly established law. They are therefore entitled to qualified

immunity.

B.

The Estate also argues that Alsup, Blaskie, Wilkins, the Berrien County officers, and

Haueisen were deliberately indifferent to Jackson's medical needs after the arrest. Under the

Fourteenth Amendment, pretrial detainees have a right to medical treatment that is analogous to the

right of prisoners under the Eighth Amendment. *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771,

776 (6th Cir. 2012). To prove a deprivation of that right, the Estate must show that the defendants

acted with "deliberate indifference to serious medical needs." *Harris v. City of Circleville*, 583 F.3d

356, 367 (6th Cir. 2009) (quotation marks omitted).

Undoubtedly, Jackson had a serious medical need: an internal liver laceration that caused

his death. The issue, therefore, is whether the defendants acted with "deliberate indifference" to that

need. To show that the officers acted with deliberate indifference, the Estate must "allege facts

which, if true, would show that the [officers] subjectively perceived facts from which to infer substantial risk to [Jackson], that [the officers] did in fact draw the inference, and that [the officers] then disregarded that risk." *Id.* at 368 (quotation marks omitted). As for a defendant's subjective knowledge, "a factfinder may conclude that a [defendant] knew of a substantial risk from the very fact that the risk was obvious." *Id.* (quotation marks omitted). We analyze separately the allegations against each defendant. *See Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012).

1.

We start by applying the three elements of the deliberate-indifference test to Officer Wilkins. First, a jury could conclude that he "subjectively perceived facts from which to infer substantial risk to [Jackson.]" The Estate says that Wilkins perceived two events that could have injured Jackson: the collision with the dumpster arm and the fight with the officers that followed. Wilkins then perceived several facts that suggested an injury had actually occurred: Wilkins heard Jackson say repeatedly that he could not stand up; and he heard Jackson's moans for help. Even though it was dark, and even though Jackson was African-American, Wilkins could see that Jackson had a rapidly forming chest bruise from his collision with the dumpster arm. Wilkins also saw Jackson's rapid physical deterioration—in only a few minutes, Jackson went from someone who could run from the police and resist repeated punches, kicks, and electric shocks, to someone who could not walk, sit, or stand up on his own.

Wilkins disputes that he actually saw Jackson's collision with the dumpster arm. But the in-car video shows that Wilkins was close behind Blaskie as the officers entered the alley, and

Blaskie admits to seeing the collision. Thus, a reasonable jury could infer that Wilkins saw the collision as well. *See Green*, 681 F.3d at 859.

Second, a jury could also conclude that Wilkins in fact drew the inference that Jackson was at a substantial risk of serious harm. Wilkins admitted in his deposition that he knew Jackson was injured: indeed, he and Alsup discussed whether Jackson needed to go to the hospital. The only question, therefore, is whether Wilkins knew that there was a substantial risk that Jackson was seriously hurt. And here, a reasonable jury could conclude that he did. Wilkins allegedly saw Jackson's collision with the dumpster arm, which was violent—so violent, in fact, that it caused Jackson to do a back flip around it. More importantly, Jackson's repeated statements that he could not stand up and his pleas of "Jesus, help me. Help me, please" made clear that he was in serious pain. Likewise, his unusually rapid physical deterioration suggested injury. Blaskie and Wilkins described Jackson as the "strongest" and "most physical" person they had ever fought; yet, in the span of a few minutes, he became nearly helpless.

In response, Wilkins argues that Jackson's superficial injuries—the bruise and a few scrapes—were not serious enough to signal a substantial risk of serious harm. Although true, this argument ignores more serious facts—the violent collision with the dumpster, the rapid change in Jackson's condition, his pleas for help—that suggested an internal injury. Wilkins also argues that Jackson simply appeared intoxicated, rather than seriously injured. That explanation rings hollow: Although Jackson was intoxicated, Officer Wilkins knew firsthand that he had been able to run and fight with the officers only moments before. Had Jackson been so drunk that he could not stand up, he would not have been able to do any of these things. Finally, Wilkins alleges that the officers

offered to take Jackson to the hospital, and that Jackson refused. But the Estate denies that allegation, and—despite Wilkins's unequivocal statement that the in-car video records such an offer—the video in fact does not. The video did record Officer Alsup asking Jackson whether he felt alright, to which Jackson allegedly responded, "Yeah, I feel okay." Jackson's voice is unintelligible in that recording, however, and there is no evidence that Wilkins even heard this brief exchange. Thus, "a jury would be entitled to discount [Wilkins's] explanation." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005).

Third, a jury could conclude that Wilkins disregarded the risk of harm to Jackson. After returning to the accident scene, Wilkins allegedly allowed Jackson to lie in the back of Alsup's car for 40 minutes without trying to help him. Moreover, there is no evidence in the record explaining the delay. There were three other officers on the scene, so Wilkins did not need to help with the search of Wade's car. And even if he had, both the jail and the hospital were only a few minutes away. Thus, Wilkins could have taken Jackson to either location, and returned to the scene in minutes.

Wilkins also appeared to violate Benton Harbor policy during the long delay. *See Harris*, 583 F.3d at 369 (holding that the failure to follow "stated jail policy" supported a finding of deliberate indifference). Benton Harbor Police Department General Order 3 provides: "Officers using force on a subject shall make **immediate** medical treatment available to that subject when . . . the subject complains of injury or continued pain . . . [or] any officer observes or suspects injury to the subject[.]" (Emphasis in original.) Here, it was clear that Jackson was in pain, and that Wilkins saw him get injured. But Wilkins did not "make immediate medical treatment available" to Jackson.

General Order 3 also provides that "[a]ny subject upon whom force is used should be monitored closely[.]" None of the officers monitored Jackson while they searched the accident scene. Finally, General Order 3 provides that "[p]ersons exhibiting signs of unusual distress should be immediately transported to a medical facility for treatment." Jackson exhibited signs of unusual distress, such as the inability to stand without help. Wilkins did not, however, transport him immediately to a medical facility.

Wilkins also failed to tell Alsup about Jackson's collision with the dumpster arm. Wilkins knew that Alsup, as the shift commander, had the final authority to decide whether Jackson should go to the hospital. Despite that knowledge, Wilkins did not tell Alsup what he had seen. This failure to pass on important information about Jackson's injury also supports a finding of deliberate indifference. *See Estate of Carter*, 408 F.3d at 313.

Wilkins then repeated this mistake at the Berrien County Jail. When he arrived, Wilkins told the officers only that Jackson "had been tased and that he had some injuries." Even after seeing that Jackson had defecated on himself, he said nothing about Jackson's collision with the dumpster arm. That mistake proved costly: Nurse Haueisen later stated that, had Wilkins passed this information on, Haueisen would have sent Jackson directly to the emergency room.

In light of these alleged facts, a reasonable jury could conclude that Wilkins "subjectively perceived facts from which to infer substantial risk to [Jackson], that [he] did in fact draw the inference, and that [he] then disregarded that risk." *See Harris*, 583 F.3d at 368. The Estate has therefore made out a potential violation of Jackson's constitutional rights. The Estate can also show

that Jackson's right to adequate medical care was clearly established at the time of the injury. *See Estate of Carter*, 408 F.3d at 313. Wilkins is not entitled to qualified immunity.

2.

We next turn to Officer Blaskie. He was similarly situated to Wilkins in many ways: he saw Jackson's collision with the dumpster arm, he heard Jackson's moans of pain, he saw Jackson's physical deterioration, and he did nothing to help him. But Blaskie differs from Wilkins in two respects. First, Blaskie spent much less time with Jackson than Wilkins did. After returning to the accident scene, Blaskie helped search the area for 15 minutes or so. He then returned to his patrol, leaving Jackson in Alsup's and Wilkins's hands. Second, Blaskie did not participate in the conversation with Alsup about whether to take Jackson to the hospital, or in the conversation with the officers at Berrien County Jail. Blaskie did not, therefore, have the same obligation to pass on his knowledge about Jackson's collision. Under these circumstances, a reasonable jury could not find that Blaskie showed deliberate indifference to Jackson's serious medical needs, largely because he had much less opportunity to. Thus, Blaskie was entitled to qualified immunity.

3.

Officer Alsup presents an easier case. He was not present when Jackson collided with the dumpster arm, and neither Blaskie nor Wilkins told him about that collision. Also, Alsup did not see Jackson before the collision, so he did not know that Jackson's behavior had changed so drastically. To Alsup, Jackson simply "looked and acted no differently than any other arrestee who fled, resisted arrest and fought with police." Jackson's Estate has not shown, therefore, that a jury

could find Alsup actually drew the inference that Jackson was at a substantial risk of serious harm. The district court properly granted him qualified immunity.

4.

The four Berrien County officers—Ronald Urick, Jason Urick, Brian Wilkey, and Perry Bundy—also present an easy case. When Wilkins came into the jail, he did not tell the officers that Jackson had collided violently with a dumpster arm. Given that Jackson's injury was an internal one, these officers had little reason to believe that Jackson might be seriously injured. In response, Jackson's Estate points to several facts: that Jackson was unable to walk on his own, that he had trouble communicating, that he had defecated on himself, and that he vomited in his cell. As Officer Bundy explained, however, these behaviors simply made Jackson "appear[] to be extremely intoxicated." Thus, the Estate cannot prove that the Berrien County officers knew a substantial risk of serious harm existed. These officers were entitled to qualified immunity.

5.

The same analysis applies to Nurse Haueisen, with one exception. Based on a report that Haueisen wrote, the Estate alleges that Haueisen realized that Jackson needed to go to the hospital at 5:40 a.m. The Estate also alleges that Haueisen did not call an ambulance until 6:22 a.m., based on the jail's video of Jackson's cell. This half-hour delay, the Estate argues, proves that Haueisen was deliberately indifferent to Jackson's medical needs.

This argument seriously distorts the record. The Estate concedes that Haueisen only realized that Jackson needed to go to the hospital after he entered Jackson's cell to perform a medical assessment. The jail's video shows that Haueisen entered Jackson's cell to perform that assessment

at 6:13 a.m., and that same video shows that Haueisen called an ambulance approximately ten minutes later. In response, the Estate points to Haueisen's report, which says that he entered Jackson's cell at 5:40 a.m. But that same report likewise says that he called an ambulance ten minutes later. What the Estate seeks to do, therefore, is use the (probably mistaken) time entry on the report for the time of the assessment, and then use the (much later) video time to determine when Haueisen called the ambulance. The Estate cannot do so: The video makes clear that Haueisen called an ambulance ten minutes afer the assessment. And the video shows that Haueisen wrote down the wrong time on the report. Thus, we must view the facts "in the light depicted by the videotape." *Green*, 681 F.3d at 859 (quotation marks omitted). This dispute, therefore, does not present a genuine issue of material fact, and the district court correctly granted qualified immunity to Haueisen.

C.

Finally, Jackson's Estate asserts municipal-liability claims against the City of Benton Harbor and Berrien County. (The Estate also asserts claims against Police Chief Al Mingo and Sheriff L. Paul Bailey in their official capacities. We do not need to discuss these claims separately, however, because "individuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003).) To establish municipal liability, the Estate must prove that "[Jackson's] constitutional rights were violated and that a policy or custom of the municipality was the moving force behind the deprivation of the plaintiff's rights." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254–55 (6th Cir. 2010) (quotation marks omitted).

1.

We first turn to the claim against Benton Harbor. The Estate argues that Benton Harbor is liable for Officer Wilkins's alleged constitutional violation because the City has a policy of inadequately training its officers. To prevail on this claim, the Estate must prove that Benton Harbor's failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 255 (quotation marks and emphasis omitted). And to prove deliberate indifference, the Estate must point to "prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse[.]" *Id.*

The Estate contends that the City was deliberately indifferent to the rights of its citizens when it failed to train its officers on Benton Harbor Police Department General Order 9. That order states in relevant part that, whenever an officer uses a taser on a suspect, the officer should take that suspect "to a medical facility for clearance prior to transport to the nearest detention facility or other institution." Had the City trained its officers on General Order 9, the Estate says, Officer Wilkins would have taken Jackson to the hospital, and Jackson would have lived. The problem with this argument is that the City had not formally adopted that order at the time of Jackson's death. And a municipality cannot "fail to train" its officers on a policy that did not exist. The Estate's real complaint, therefore, is that the City had not adopted General Order 9. But "the fact that alternative procedures might have better addressed [Jackson's] particular needs does not show that the [City] was deliberately indifferent[.]" *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004) (alterations and quotation marks omitted).

The Estate also contends that Officer Wilkins's failure to take Jackson to the hospital proves that the City did not train him properly. But the Estate must point to more than "an isolated, one-time event" to prove that the City had a policy of inadequate training. *See Fox v. Van Oosterum*, 176 F.3d 342, 348 (6th Cir. 1999). Instead, it must provide evidence, rather than mere allegation, of "prior instances of unconstitutional conduct." *Miller*, 606 F.3d at 255. And the Estate has not done so.

As an alternative basis for liability, the Estate argues that Benton Harbor had a policy of failing to discipline its officers for their constitutional violations. Like the failure-to-train claim, however, the Estate must show that Benton Harbor's failure to discipline amounts to "deliberate indifference." *See Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994). In its attempt to make that showing, the Estate cites only one alleged failure to discipline: the case before us. One example of the City's failure to discipline, however, does not prove that the City had a *policy* of failing to discipline. *See id.* at 1355. So the district court correctly rejected this argument.

2.

As for the claim against Berrien County, the Estate cannot show that any of the County's agents violated Jackson's constitutional rights. Thus, the County itself cannot be held liable under § 1983. *See Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 488 (6th Cir. 2007).

\*　　\*　　\*

The district court's judgment is affirmed, except that its grant of summary judgment to Officer Wilkins is reversed. The case is remanded for further proceedings consistent with this opinion.

**ALICE M. BATCHELDER, Chief Circuit Judge, concurring in part and dissenting in part.** I would affirm the district court's orders in their entirety. Therefore, I concur in the majority opinion but for Section II.B.1, in which the majority finds that Officer Jim Wilkins was deliberately indifferent to arrestee Jackson's serious medical need. Because I agree with the district court that, on this record, a reasonable jury could not find that Officer Wilkins actually perceived a substantial risk to Jackson, and because I find no evidence that Officer Wilkins displayed the requisite mental state, I must respectfully dissent from that portion of the opinion. I write separately to explain.

## I.

A constitutional claim for deliberate indifference contains both an objective and a subjective component. *Harris v. City of Circleville*, 583 F.3d 356, 368 (6th Cir. 2009) (citations omitted). The objective component requires the plaintiff to show the existence of a "sufficiently serious" medical need, *id*. (quotation marks omitted); that is, an actual "need for medical treatment [that] . . . was not addressed within a reasonable time," *id*. at n.6 (quotation marks and citation omitted). Jackson's internal liver laceration was a life-threatening injury that needed timely medical treatment.

Accepting that the plaintiff (the estate of the deceased arrestee) has satisfied the objective component of the deliberate-indifference test leads us to the other half, the subjective component:

> To satisfy the subjective component, the plaintiff must allege facts which, if true, would show
>
> [1] that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner,
>
> [2] that he did in fact draw the inference, and
>
> [3] that he then disregarded that risk.

> Emphasizing the subjective nature of this inquiry, . . . an official's failure to alleviate a significant risk that he *should have* perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment.

*Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001), relying on *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994) (quotation marks omitted, paragraph breaks added, and emphasis altered).

The district court and the majority both identified and relied on this same three-part test and both acknowledged the same general facts concerning Jackson's condition, but they drew opposite conclusions when applying this test to these facts. In the district court's view, these facts would not demonstrate that Jackson was at a substantial risk of a serious medical need, and moreover, no officer (including Officer Wilkins) had actually drawn any such inference from these facts:

> Upon careful review of the record, th[is] [district] [c]ourt finds that Plaintiff has not met [it]s burden of presenting evidence that any of the Benton Harbor Defendants were aware that [Jackson] had a serious medical condition when he was in the custody of the Benton Harbor officers [which includes Officer Wilkins].

> Plaintiff relies on observations by Officers Wilkins and Blaskie that Jackson required assistance in getting into the police vehicle after being subdued, and that he had suffered injuries. Plaintiff also relies on the fact that [Jackson] defecated in the police vehicle en route to the jail. However, this evidence does not support a finding that the Benton Harbor officers were aware of facts from which the inference could be drawn that a substantial risk of serious medical harm existed, and that one or more of the officers actually drew that inference.

> The visible injuries sustained by Jackson — scrapes and a bruise — were not plainly indicative of life-threatening condition. Jackson's difficulty in standing up and getting into the police vehicle would not seem extraordinary given the alley tussle and the fact that Jackson was handcuffed behind his back. Finally, the officers' decision to transport Jackson to jail rather than to a hospital was made prior to his defecation in the police vehicle.

> The Benton Harbor police officers made a decision to transport an uncooperative arrestee directly to jail, knowing that the jail would have a nurse and

medical clinic. Jackson himself stated that he did [not] need to go to a hospital.[1] While the officers knew that Jackson had suffered superficial injuries from their use of non-lethal force, there is no evidence that the officers knew or could have known that Jackson had suffered a life-threatening injury. The seriousness of Jackson's condition was arguably more apparent by the time the officers arrived at the Berrien County jail, but the Benton Harbor officers were told by nurse Haueisen that 'if he needs to go to the hospital, we'll take care of it.'

On these facts, it cannot be said that [any] reasonably competent officer would conclude that the Benton Harbor officers' decision to transport Jackson directly to jail would be a violation of his constitutional rights. Accordingly, the Benton Harbor Defendants are entitled to qualified immunity and summary judgment on all claims pertaining to their alleged failure to provide medical care.

R. 162 at p. 10-11 (Dist. Ct. Op., Mar. 28, 2012) (editorial marks and citations omitted).

But in the majority's view, the facts demonstrate that Jackson was at a substantial risk of a serious medical need and also that Officer Wilkins (alone) not only recognized that risk but then consciously disregarded that risk as a means of inflicting punishment on Jackson. *See Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005) (explaining that the officer's "state of mind must evince deliberateness tantamount to intent to punish"). The majority reverses the grant of qualified immunity to Officer Wilkins, while affirming the grant of immunity to all other defendants.

I cannot join the majority in this conclusion. When I apply the controlling law to the generally agreed-upon facts, I do not find these facts as compelling as the majority does; I do not find it reasonable to presume from these facts that Officer Wilkins actually recognized a substantial risk

---

[1]Based on the context of this passage, the district court's omission of the word "not" was presumably a typographical error, and the court meant to write that "Jackson himself stated that he did *not* need to go to a hospital." All three officers asserted that Jackson stated that he did *not* need to go to the hospital. R. 121-2 p. 14, 16, 19, 34; 121-4 p. 21, 20:15-18, 27:22-28:9; 122-3 p. 22, 80:16-81:8, 82:19-83:2, 88:4-25. On the other hand, there is no evidence that Jackson stated that he *did* need to go to the hospital, nor did the plaintiff contend that Jackson stated as much.

of a life-threatening injury; and I do not find that Officer Wilkins acted with the requisite mental state of "deliberateness tantamount to intent to punish," *see Miller*, 408 F.3d at 813.

## II.

There is no dispute about the controlling law. We apply the aforementioned three-part test to determine the subjective component of a constitutional violation for deliberate indifference. *See Farmer*, 511 U.S. at 837; *Harris*, 583 F.3d at 368; *Comstock*, 273 F.3d at 703.

## A.

First, the plaintiff must allege facts which, if true, would have been sufficient to alert the defendant to the substantial risk to the arrestee. *Comstock*, 273 F.3d at 703. This is not a rigorous standard and, in fact, the Supreme Court phrased this as "facts from which the inference *could be* drawn that a substantial risk of severe harm exist[ed]." *Farmer*, 511 U.S. at 837 (emphasis added). More importantly, the plaintiff must show that the defendant actually recognized or perceived those facts. *Comstock*, 273 F.3d at 703. The majority identifies and relies on six specific facts: (1) Jackson claimed he could not stand up; (2) Jackson moaned for help from Jesus; (3) Jackson had a chest bruise; (4) Jackson displayed rapid physical deterioration; (5) Jackson had a violent collision with a dumpster; and (6) Jackson was not so drunk that he could not run or fight.

There is no dispute as to whether Officer Wilkins recognized or perceived these facts — he did. The only question at this point is whether these facts indicate a substantial risk to Jackson due to a serious medical problem. The district court held that these facts did not indicate a substantial risk whereas the majority holds that they did. Although I am inclined to agree with the district court, I am willing to concede any factual dispute and agree that, viewed generously (and out of context),

these facts "could" indicate a substantial risk of a serious medical need. Therefore, I will accept for

the present that the plaintiff has satisfied this first part: Officer Wilkins actually perceived facts from

which he could have inferred a substantial risk to Jackson. *See Comstock*, 273 F.3d at 703.

**B.**

For the second part of the three-part test, the plaintiff must allege facts which, if true, would

show that the defendant did in fact draw the inference of a substantial risk of life-threatening injury

to the arrestee. *Comstock*, 273 F.3d at 703. The majority reiterates the same six (6) facts as proof

that Officer Wilkins actually, subjectively drew the inference that Jackson was at serious risk of a

life threatening injury. There are two aspects to this that compel my disagreement.

First, this part of the test is supposed to be about the *defendant* — did the *defendant* actually

draw the inference? *See Comstock*, 273 F.3d at 703. The most direct way to satisfy this part would

be for the plaintiff to allege facts about the *defendant's* statements, actions, inactions, etc.

Specifically, in order to show that Officer Wilkins actually drew an inference, there would be some

fact alleged about Officer Wilkins. Here, all we have are six facts about Jackson, and those just the

same six merely reiterated from the first part of the test. The plaintiff has pointed to no facts about

Officer Wilkins to show that he actually drew the inference and the majority cites none either.

But there is a second aspect to this that warrants some considerable discussion, inasmuch as

a plaintiff may satisfy this part by showing that the risk was "so obvious and substantial that the

official[] must have known about it." *Farmer*, 511 U.S. at 852 (Blackmun, J., concurring); *accord*

*Harris*, 583 F.3d at 368 (relating that "a fact-finder may conclude that [an] official knew of a

substantial risk from the very fact that the risk was obvious" (quotation marks and citations

omitted)). In such a situation, facts about the arrestee or the surrounding circumstances (i.e., the same facts that satisfy the first part) could be or would be sufficient to satisfy the second part. Although unarticulated, it might be that this is the majority's view of the present facts — that these six facts render the risk so obvious that Officer Wilkins *must have* known. If so, I cannot agree.

Before considering the individual facts, it bears mention that Jackson's lacerated liver was wholly unknown and unsuspected by *anyone* until after the autopsy. Immediately upon crashing into the dumpster, thereby lacerating his liver, Jackson jumped back up and took off running again. The officers chased him and, in an effort to subdue him, tased him, wrestled him down, kneed him in the back and legs, hit him, and tased him even more (12 times in all). Eventually, they wore him out, cuffed his hands behind his back, and laid him on his stomach. R. 121-2, p. 12-16; 135-2, p. 17-22. Nothing suggests that either Jackson or the officers knew that Jackson had lacerated his liver. The officers did know that Jackson was drunk, which was later confirmed when the autopsy revealed that his blood alcohol was 0.17 at the time of his death, some four hours after this fight with and flight from the police. R. 121-2, p. 4 (time of death 8:45 a.m.); p. 37 (0.17 blood alcohol content).

Neither the jail deputies[2] nor the jail nurse, Mark Haueisen, suspected a lacerated liver or internal injuries. R. 136-2 (Haueisen depo.). The paramedics who responded to the call spent 34 minutes treating Jackson in the ambulance (6:42 a.m. to approximately 7:16 a.m., the first 31 sitting in the port at the jail, *see* R. 121-2 p.47), but did not suspect a lacerated liver; rather they administered "CPR for cardiac arrest," *see* R. 135-3, p. 4. And the Lakeland Hospital emergency

---

[2] At least one of the inmates interviewed by the Michigan State Police investigator stated that a jail deputy had told him that he thought Jackson had overdosed on drugs. R. 121-2 p. 44. None mentioned any internal injury.

staff spent 1.5 hours (approximately 7:15 a.m. to 8:45 a.m.) treating Jackson in the emergency room, but the lacerated liver was not discovered until the autopsy. That same morning, while Jackson was still in the hospital but "not expected to survive," the Michigan State Police initiated an investigation and at that point, prior to the autopsy, an investigator noted that "the pathologist performing the autopsy should contact the University of Miami [] in reference to evidence collection from deaths as a result of *excited delirium*." R. 121-2, p. 7 (emphasis added). Later, a second Michigan State Police investigator noted in his report that he had spoken with Jackson's girlfriend, Imogene Wade, at approximately 12:50 p.m. that day and had told her that Jackson had apparently died from "heart failure" or a "heart attack." R. 121-2, p. 37. He noted that a preliminary assessment by medical examiner Dr. Robert Clark had also suggested a heart attack. R. 121-2, p. 37. The lacerated liver was neither suspected nor discovered until the full autopsy the next day. R. 121-2, p. 39.

The majority cites six facts from which Officer Wilkins must have drawn the inference that Jackson was at a substantial risk of serious harm. *See Farmer*, 511 U.S. at 837. These facts are: (1) Jackson claimed he could not stand up; (2) Jackson moaned for help from Jesus; (3) Jackson had a chest bruise; (4) Jackson displayed rapid physical deterioration; (5) Jackson had a violent collision with a dumpster; (6) Jackson was not so drunk that he could not run or fight. Let us consider whether any of these six facts render the underlying risk "so obvious and substantial that [Officer Wilkins] must have known about it." *See Farmer*, 511 U.S. at 852 (Blackmun, J., concurring).

### 1. *Jackson's claims that he could not stand up.*

After subduing Jackson, Officers Wilkins and Blaskie cuffed his hands behind his back and placed him on his stomach while all three paused to catch their breath as they recovered from the

chase and the fight. R. 122-3 p. 17, 61:11-13 ("the officers . . . were taking a break because they were out of breath"); R. 121-2 p. 16 (Jackson "was breathing very hard as were both officers"). Officers Wilkins and Blaskie then attempted to direct Jackson into the back of Officer Alsup's patrol car. In a recording from Officer Alsup's patrol-car video, Jackson can be heard gasping and slurring his words, and then he said several times that he could not stand up on his own, while the officers coaxed and threatened him to get in the car. R. 122-4 (Alsup In Car Video, 6:42 to 8:01 min. mark). This conversation lasted a little over one minute while the officers put Jackson into the car.

The officers' comments on the recording, their testimony, and the findings of the Michigan State Police investigation indicate — and there is no evidence to the contrary — that neither the officers at the scene nor anyone else believed Jackson's claims that he could not stand up. *See* R. 121-2 p. 14 (Wilkins statement to the Michigan State Police investigator); p. 16 (Blaskie statement); p. 19 (Alsup's statement that Jackson "looked no different than anyone who has fought with or ran from the police."); R. 121-4 p. 30, 29:1-20 (Wilkins depo.); R. 121-3, p. 19-20, 69:21-72:21 (Blaskie depo.); R. 122-3 p. 21-24 (Alsup depo.); R. 136-2 p. 17, 56:21- 57:20 (Haueisen depo., expressing a belief that Jackson's refusal to stand might have been a form of "passive resistance"). The majority, however, holds that Officer Wilkins did believe that Jackson could not stand up and that from that belief he drew the inference that Jackson was at risk of a life-threatening injury.

Even assuming that Officer Wilkins did believe that Jackson could not stand up, it is at most *possible* that Officer Wilkins attributed the cause to a life-threatening injury — it is just as likely that Officer Wilkins attributed the cause to Jackson's exhaustion, intoxication, hands being cuffed behind

-24-

his back, or passive resistance.[3] Jackson had just crashed a car, engaged in a lengthy fight with and flight from the police, been manhandled and tased multiple times, and had his hands cuffed behind his back. During the 80 seconds that he claimed he could not stand up, he was visibly drunk and gasping for breath. As the district court put it: "Jackson's difficulty in standing up and getting into the police vehicle would not seem extraordinary given the alley tussle and the fact that Jackson was handcuffed behind his back." More to the point, I cannot agree that this fact implicates an underlying risk so obvious and substantial that Officer Wilkins must have known about it.

### 2. Jackson moaned for help from Jesus.

After claiming that he could not stand up, and being placed in Alsup's car, Jackson pled to God and moaned for the next few minutes. R. 122-4 (Alsup In Car Video, 8:01 to 13:36 min. mark).

> Jackson: Please, help me. Please, Lord. Please, help me, Jesus. I cannot stand. I cannot stand. Oh, Lord, help me. Jesus, help me. Help me, please. Help me. Help. Help me. Oh, Lord. Oh.

R. 122-4 (Alsup In Car Video, 8:01 to 8:27 min. mark). Whereas Officer Wilkins characterized this as Jackson "just saying, 'Oh Jesus, help me out of this'" trouble I'm in with the police, R. 121-2 p. 14, the majority holds that Jackson's pleas and moans "made clear that [Jackson] was in serious pain." While it is certainly possible — even likely given his actual injury — that Jackson was in pain, I cannot agree that this pleading and moaning necessarily demonstrates that pain or, more to the point, necessarily renders the underlying risk unmistakably obvious and substantial.

---

[3]The plaintiff submitted four expert opinions, none of which asserts that an inability to stand up is a symptom of a life-threatening internal injury, such as an internal liver laceration. *See* R. 134-5 (Dragovic Report); 135-1 (Behrens-Hanna Report); 135-2 (Peters Report); 135-3 (Mehlman Report). And, as it turns out, no one involved in this case ever drew that inference; not the other officers, the jail deputies, the jail nurse, the EMTs, or the emergency room staff.

Recall that Jackson had just finished a lengthy flight from and fight with two police officers, been manhandled and tased multiple times, and was drunk, captured, and in serious trouble. More importantly, Jackson *never* said: "I am injured," "I am in pain," "my chest/stomach/liver is injured," "my chest/stomach hurts," "I ran into a dumpster," "I need a doctor," "I am dying," or anything like that. Although he moaned and prayed, Jackson never complained expressly about any injury or pain. In fact, the next time Jackson is heard to speak on the recording, he says just the opposite:

> Officer Alsup:          You feel alright?
>
> Jackson:               Yeah, I feel okay.

R. 122-4, 2:55. This is consistent with the statements by and testimony of all three officers (Wilkins, Blaskie, and Alsup), to the effect that Jackson had no desire to go to the hospital. R. 121-2 p. 14, 16, 19, 34; 121-4 p. 21, 20:15-18, 27:22-28:9; 122-3 p. 22, 80:16-81:8, 82:19-83:2, 88:4-25.

The standard requires (and the majority holds) that Officer Wilkins must have subjectively recognized from these statements and moans that Jackson was in such pain as to put him at risk of a serious, life-threatening injury. But given the circumstances and the incredibly vague nature of Jackson's statements, it would not have been unreasonable for Officer Wilkins to think (even mistakenly) that Jackson was just lamenting the trouble he was in. A reasonable person under these circumstances would not necessarily conclude from these few minutes of praying and moaning that Jackson was in such pain that he was at risk of a life-threatening internal injury. Morever, I do not find it reasonable to conclude that Officer Wilkins necessarily drew such an inference.

### *3. Jackson had a large bruise on his chest.*

Officer Wilkins testified that, while still at the scene, he noticed the bruise on Jackson's chest, which he assumed had come from Jackson's running into the dumpster or his fight with the officers. R. 121-4 p. 23, 22:3-7; p. 27, 26:5-22. But Officer Wilkins further testified that he thought that the bruise, as with Jackson's other injuries, was merely "superficial." R. 121-4 p. 30, 29:7-14. The district court said the same: "The visible injuries sustained by Jackson — scrapes and a bruise — were not plainly indicative of life-threatening condition." R. 162 at p. 11 (Dist. Ct. Op.). Even the majority appears to discount this fact, accepting as "true" Officer Wilkins's argument "that Jackson's superficial injuries — the bruise and a few scrapes — were not serious enough to signal a substantial risk of harm." If it is true, as both the majority and the district court have written, that the bruise was not so serious as to signal a substantial risk of a life-threatening condition, then it is only reasonable to conclude that it did not in fact alert Officer Wilkins to such a risk.

### *4. Jackson displayed rapid physical deterioration.*

As discussed in the foregoing sections, after the officers subdued and handcuffed Jackson, he stopped fighting and tried to catch his breath. R. 121-2 p. 16 ("[Jackson] went to his knees [and] was breathing very hard . . . [so] [Officer Blaskie] let [Jackson] rest for a little bit"). But as the officers attempted to direct Jackson into the patrol car, Jackson was claiming that he could not stand up on his own or help himself into the car. This lasted at least until he was in the car.

In their reports to the Michigan State Police investigator, none of the officers on the scene (Wikins, Blaskie, or Alsup) noted Jackson's condition as remarkable. In fact, Officer Alsup said that Jackson "looked no different than anyone who has fought or ran from police." R. 121-2 p. 19. At

his deposition, Officer Alsup testified that it was his decision to send Jackson to jail instead of the

hospital, R. 122-3 p.23, 82:7-20, which he based in part on his view of Jackson's condition:

> [Jackson] didn't appear to be any different than any other person who's ever ran . . .
> [t]hat's ever ran from the police and been caught. Intoxicated. Been tased. He's not
> the first person that's ever defecated on their self or urinated on them self during or
> after a tasing. I've been tased myself and had no medical treatment. . . . Just like
> everybody else, he - - my observation of him was just like any other suspect that's
> been taken to jail with no visible injuries.

R. 122-3 p. 24, 88:12-23. As noted previously, the record reveals that none of the officers believed

Jackson's claims that he could not stand up and, a short time later, Officer Alsup asked Jackson,

"You feel alright?", to which Jackson responded, "Yeah, I feel okay." R. 122-4, 2:55.

The majority says: "Wilkins also saw Jackson's rapid physical deterioration — in only a few

minutes, Jackson went from someone who could run from the police and resist repeated punches,

kicks, and electric shocks, to someone who could not walk, sit, or stand up on his own." This

statement assumes two things which may in fact not be true: (1) that Jackson *actually* could not

walk, sit, or stand up on his own; and (2) that Officer Wilkins believed this to be true. This also

appears to ignore the likelihood that *anyone* subjected to numerous punches, kicks, and taser shocks

would exhibit rapid physical deterioration. That was the purpose of those punches, kicks, and shocks

— to incapacitate Jackson. It also bears mention that it was during this few minutes of rapid

transformation that the officers cuffed Jackson's hands behind his back, disabling him further.

Even assuming that Officer Wilkins did believe that Jackson could not actually walk, sit, or

stand up, and accepting that one reason for this could have been Jackson's internal injury, this is but

one possible reason. Jackson had just fled from police and resisted arrest, crashed a car, engaged in

a lengthy fight with two police officers, been manhandled and tased multiple times, and had his

hands cuffed behind his back. Jackson was clearly intoxicated and gasping for breath. It would not

be unreasonable for Officer Wilkins to have attributed Jackson's inability to stand up to his

exhaustion, intoxication, hands being cuffed behind his back, or passive resistance. As the district

court put it: "Jackson's difficulty in standing up and getting into the police vehicle would not seem

extraordinary given the alley tussle and the fact that Jackson was handcuffed behind his back."

### 5. *Jackson had a violent collision with a dumpster.*

The majority points to Officer Wilkins's knowledge of Jackson's violent collision with the

dumpster arm as proof that Officer Wilkins knew that Jackson was at substantial risk of a life-

threatening injury. There is no dispute that Officer Wilkins knew of this violent collision[4] — in fact,

while still at the scene, Officers Wilkins and Blaskie determined that the deep bruise on Jackson's

---

[4]The majority attacks Officer Wilkins's testimony that he did not actually *see* Jackson collide with the dumpster, writing that "Wilkins disputes that he actually saw Jackson's collision with the dumpster arm," but "Wilkins was close behind Blaskie" and "Blaskie admits to seeing the collision." Maj. Op., *supra*. But Officer Blaskie did *not* admit to seeing the collision. R. 121-2 p. 15. In three separate places in his deposition, Blaskie testified that he did not actually see Jackson run into the dumpster, R. 121-3 p. 15, 53:23-24 ("I didn't know what exactly happened to cause [the backflip]."); p. 16, 55:15-19 ("unknown object"); p. 21, 74:17-20 ("Q. Did you ever see him come into contact with the dumpster? A. I saw him come into contact with something - - at the time that it happened, I didn't know what it was but once I went back to the area where it happened, I realized what it was."). Officer Blaskie testified that he and Officer Wilkins figured it out, p. 21, 76:6-8 ("After going back and looking at the area and from what I had seen during the incident, I concluded that he ran, as he turned the corner he ran into the, into the dumpster."); p. 22, 78:16-21 ("At some point while we were at the scene we noticed bruising . . . [and] we made the conclusion that that was the part of the dumpster that he hit."). Officer Wilkins testified consistently. R. 121-4 p. 27-28, 26:19-27:12 ("Q. Did you see him go into the dumpster? A. I saw him cut around the corner and then come back out, and then as I - - because [Jackson and Officer Blaskie] were a little bit further ahead of where I was at. . . . Q. . . . . You said . . . you saw [Jackson] go backwards. . . . A. Right. And then as I come up to the corner, I saw there was a dumpster immediately there so - - -. Q. You just put two and two together? A. Right."). Officer Wilkins told the Michigan State Police investigator that Jackson ran into the dumpster, and though he did not see it himself (he was behind Officer Blaskie), he acknowledged that he was aware that Jackson had run into the dumpster. R. 121-2 p. 13. Officer Alsup stated that it was "very dark" in the alley at the location of the dumpster, R. 122-3 p. 19, 67:17-68:7, and Officer Blaskie said it was "pitch black," R. 121-2 p. 16. To summarize: Officer Wilkins acknowledged that he knew, while at the scene, that Jackson had a violent collision with the dumpster, one which left a severe bruise. The majority inaccurately portrays Officer Wilkins as untruthful as support for its assertion that a jury would disbelieve him. This appears to me to be unnecessary and improper.

chest was most likely the result of this collision. R. 121-4 p. 27-28, 26:19-27:12. But knowing of the collision — no matter how violent — is far from knowing that the collision caused a life-threatening injury. If the collision had incapacitated Jackson, then a case could be made that Officer Wilkins *should have known* that Jackson was severely injured, but the collision did not incapacitate Jackson. Rather, there was no basis for Officer Wilkins to suspect that the collision had caused a serious injury and no evidence to show that Officer Wilkins actually thought so. Far from being an obvious indication of a substantial injury, Jackson made it appear "obvious" that it was not.

After running into the dumpster and flipping over backwards, Jackson jumped up immediately, took off running, and then continued a relentless fight with two officers. Officers Blaskie and Wilkins chased him, tased him, wrestled him down, kneed him in the back and legs, hit and kicked him, and tased him even more, 12 times in all. Officer Wilkins told the Michigan State Police investigator that Jackson was "abnormally strong even with both of them fighting with him." R. 121-2 p. 14. Officer Blaskie reported that Jackson was "stronger than anyone he has ever fought with before," and the blows and kicks they gave Jackson "had no effect." R. 121-4 p. 16; *see also* R. 121-3 p. 16-19, 56:25-68:16 (Blaskie depo.). They were describing Jackson's prowess *after* his collision with the dumpster arm. At deposition, both officers testified to the following:

| Question: | All right. When, until the time you got handcuffs on Mr. Jackson, did he ever stop struggling? |
| Officer Blaskie: | No. |

R. 121-3 p. 22-23, 81:25-82:2 (Blaskie depo.).

| Question: | Did Mr. Jackson ever stop fighting and resisting until he was in cuffs? |

Officer Wilkins:        No.

R. 121-4 p. 29, 28:17-19 (Wilkins depo.).

To repeat, this running, fighting, and resisting happened *after* Jackson's collision with the arm of the dumpster. Given these circumstances, there was no basis for Officer Wilkins — or anyone — to suspect that this collision had caused a serious, life-threatening injury to Jackson.

### 6. *Jackson was not so drunk that he could not run or fight.*

The majority rejects Officer Wilkins's explanation that he thought Jackson's submission and physical deterioration were due to his severe intoxication rather than a serious injury, on the basis that Jackson's intoxication was consistent throughout. In this sense, this is just a reiteration of the rapid-physical-transformation claim above, which has already been discussed fully.

In another sense, however, it bears mention that Jackson was severely intoxicated. Jackson's blood alcohol content (BAC) at his autopsy was 0.17, which is presumably reflective of his BAC at the time of his death, and suggests that his BAC was even higher at the time of his arrest some four hours earlier. This is consistent with Imogene Wade's (Jackson's girlfriend's) statement to the Michigan State Police investigator that Jackson had been "drinking throughout the day" and had "consumed quite a bit," R. 121-2 p. 37, and the audio recording from Officer Alsup's dash–cam at the time of the arrest, in which Jackson was badly slurring his words. R. 122-4. Unlike the majority, I would not find it unreasonable that the physical condition of a man with a 0.17-or-greater BAC would deteriorate rapidly after running from the police, fighting with two police officers, and being tased 12 times. I cannot conclude that Jackson's ability to run and fight despite his intoxication is proof of an intervening serious injury when there were so many other intervening factors.

To summarize this part of the test, the plaintiff has not pointed to any facts to demonstrate that Officer Wilkins subjectively drew the inference that Jackson was at a substantial risk of a serious medical need. Nor do the present facts demonstrate a risk so obvious and substantial that a reasonable juror could conclude that Officer Wilkins must have drawn the inference. I agree with the district court that the plaintiff failed to allege sufficient facts to satisfy this part of the test.

## C.

Finally, the plaintiff must allege facts which, if true, would show that the defendant consciously disregarded the known risk and did so with a "deliberateness tantamount to intent to punish." *See Miller*, 408 F.3d at 813; *Comstock*, 273 F.3d at 703 ("Emphasizing the subjective nature of this inquiry, . . . an official's failure to alleviate a significant risk that he *should have* perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment.").[5] I believe that the plaintiff has fallen far short of such a showing in this case.

The majority identifies five (5) actions, or rather inactions, by Officer Wilkins that demonstrate, in its view, Officer Wilkins's infliction of punishment on Jackson:

---

[5] As the Supreme Court articulated in *Farmer*, a case about the risk underlying a prison official's decision to house an effeminate, trans-gender male in the general population of a men's prison:

> In . . . situations[] where the decisions of [the] officials are typically made in haste, under pressure, and frequently without the luxury of a second chance, an Eighth Amendment claimant must show more than 'indifference,' deliberate or otherwise. The claimant must show that officials [acted] maliciously and sadistically for the very purpose of causing harm, or, as the Court also put it, that officials [acted] with a knowing willingness that harm occur.

*Farmer*, 511 U.S. at 835-36 (quotation marks, editorial marks, and citations omitted).

1. "[Officer] Wilkins allegedly allowed Jackson to lie in the back of [Officer] Alsup's car for 40 minutes without trying to help him."[6]

2. "[Officer] Wilkins did not 'make immediate medical treatment available' to Jackson."[7]

3. "None of the officers[, including Officer Wilkins,] monitored Jackson while they searched the accident scene."[8]

4. "[Officer] Wilkins also failed to tell [Officer] Alsup about Jackson's collision with the dumpster arm."[9]

5. "[Officer] Wilkins then repeated this mistake [i.e., failed to tell about the collision with the dumpster arm] at the Berrien County Jail."[10]

If we accept these five accusations as true and assume that Officer Wilkins did fail to fulfill all (or any) of these five duties, then the plaintiff has stated a colorable claim for negligence. Of course, as has been oft repeated here and elsewhere, deliberate indifference requires more than mere

---

[6]It is interesting that the plaintiff did not investigate or raise this particular claim in the district court. Plaintiff's counsel deposed Officers Wilkins, Blaskie, and Alsup (as well as the chief of police, several jail deputies, and the jail nurse), but never questioned any of them as to why Jackson was left in the back of Officer Alsup's patrol car for 40 minutes. In fact, not only did plaintiff's counsel never ask why they waited 40 minutes, the general topic of Jackson's waiting (even the 25-30 minutes that Officer Wilkins estimated) at the scene was never raised. Rather, plaintiff's counsel questioned why Officer Wilkins transported Jackson to the jail rather than to the hospital. Officer Wilkins answered that question four times during his deposition, explaining that he took Jackson to jail at the instruction of Officer Alsup, his shift supervisor and the officer in command. R. 121-4 p.21, 20:7-12; p.22, 21:20-22:2; p.25, 24:10-14. Officer Alsup also testified that it was his on-scene decision to send Jackson to jail rather than to the hospital. R. 122-3 p. 23, 82:7-20.

[7]*See* note 6, *supra*. Officers Wilkins and Alsup both testified that it was Officer Alsup's decision to send Jackson to jail rather than the hospital. R. 121-4 p.21, 20:7-12; p.22, 21:20-22:2; p.25, 24:10-14; R. 122-3 p. 23, 82:7-20.

[8]This is simply contrary to the evidence in the record. All three officers (Wilkins, Blaskie, and Alsup) told the Michigan State Police investigator that they did, in fact, monitor Jackson. Officer Wilkins told the investigator, "yes, [Jackson] was checked on several times and each time he was sitting in a different position." R. 121-2 p. 14-15. Officer Blaskie told the investigator the same. R. 121-2 p. 16. Officer Alsup told the investigator that he "looked in on" Jackson and at one point helped Jackson reposition himself. R. 121-2 p. 19. Only Officer Wilkins touched on this topic at his deposition, in which he said that he and Alsup were outside the car talking with Jackson. R. 121-4, 23:9-15.

[9]Note that Jackson himself also failed to tell Officer Alsup about his collision with the dumpster arm, even though Jackson was conversant and actually conversing with Officer Alsup.

[10]Note that Jackson also failed to tell anyone at the Berrien County Jail about his collision with the dumpster arm, even though Jackson was conversant upon arrival and placement in the cell.

negligence. *See Comstock*, 273 F.3d at 707 ("an *inadvertent* failure to provide adequate medical care . . . would entitle [the officer] to qualified immunity"); *Smith v. County of Lenawee*, No. 11-1523, 2012 WL 5861811, *5 (6th Cir. Nov. 20, 2012) ("deliberate indifference is not mere negligence"); *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) (same); *Miller*, 408 F.3d at 813.

Unless the plaintiff can point to some more egregious conduct by Officer Wilkins or evidence of Officer Wilkins's actual motive with regard to his actions, I cannot conclude that Officer Wilkins acted with the requisite mental state necessary to show that he was deliberately indifferent. Qualified immunity protects Officer Wilkins against such mere negligence claims. *See, e.g, Williams v. Sandel*, 433 F. App'x 353, 363 (6th Cir. 2011). It should do so here.

## III.

In summary, I would affirm the district court's orders granting qualified immunity to all of the defendants in this case, including Officer Wilkins. Because I cannot agree with the majority's findings or analysis concerning Officer Wilkins, I respectfully dissent from Section II.B.1 of the majority's decision. I otherwise concur in the majority's judgment.