Deborah MORABITO, Administrator of
Estate of other; James L. Morabito,
Plaintiff–Appellee,

v.

Roger HOLMES; Joseph Rauscher,
Defendants–Appellants,

and

John Does 1–4, Defendants.

No. 14–3612.

United States Court of Appeals,
Sixth Circuit.

Oct. 7, 2015.

BEFORE: NORRIS, SUTTON, and DONALD, Circuit Judges.

## OPINION

ALAN E. NORRIS, Circuit Judge.

Deborah Morabito, mother of James Morabito and the administrator of his estate,[1] sued corrections officers Roger Holmes and Joseph Rauscher, among others, for excessive use of force and denial of medical treatment under 42 U.S.C. § 1983, and for related state-law intentional tort claims. Defendants Holmes and Rauscher moved for summary judgment based on qualified immunity, which the district court denied. This appeal followed. For the reasons that follow, we AFFIRM in part, and REVERSE in part.

## I.

The morning of February 18, 2011, James Morabito was arrested for disorderly conduct and possessing an open container of alcohol. At just before one o'clock in the afternoon, he was booked into the city jail in Cleveland, Ohio, and this suit arises out of his brief incarceration there. Defendants Holmes and Rauscher reported to work at the jail a couple of hours after he arrived. By that time, Morabito was on "suicide watch," which means he was dressed in a paper outfit to limit his ability to harm himself, and he was moved to a more visible jail cell so that corrections officers could better monitor him. According to Mrs. Morabito, her son suffered from Tourette's syndrome, anxiety, insomnia, depression, obsessive-compulsive disorder, and bi-polar disorder; he required medication to control symptoms such as severe ticks, verbal outbursts, anxiety, frustration, and withdrawal. Apparently Morabito had elected to stop taking his medication approximately one week prior to his arrest.

Before and after Defendants arrived for their shift, Morabito repeatedly requested medication. By the time Defendants arrived for work, Morabito already was scheduled to see the jail's nurse, who was expected to arrive around 5:30 p.m.

Defendants stated that Morabito was loud, verbally combative, and repeatedly demanded medical care. Plaintiff does not dispute this characterization, but explained that the stress of being jailed, exacerbated by being off his medication, triggered the deceased's disorders and caused him to experience severe emotional distress.

The alleged excessive force occurred at approximately 7:30 p.m. that evening. The parties characterize the incident quite differently, but each characterization is consistent with the video evidence captured by the jail camera and is supported by some testimonial evidence. Plaintiff's version of events is that Defendants entered Morabito's cell without a legitimate purpose—they simply were frustrated with Morabito's outbursts and demands for medical treatment—and stood over him, taunting him. Morabito was sitting on his cell floor in his paper suit, not attempting to hurt himself, and posing no threat to anyone else. Defendants then knocked Morabito's head aside, pinned him to the ground, punched him, and then used a Taser against his neck for five seconds. Morabito was not treated for any injuries at the jail, but he saw the nurse shortly after the

---

1. Morabito died approximately one month af- ter the events of this case.

incident to address his need for medication. Morabito was released the next morning, and complained to his mother about being beaten up and tased. Soon after his release, Morabito visited a doctor complaining of his injuries.

Defendants claim that Morabito stated a desire to harm himself in his cell (unfortunately the jail video recording does not include audio). In order to calm him and thwart any attempts at self-inflicted harm, Defendants entered Morabito's cell. Morabito continued his aggressive outbursts and eventually attempted to spit on Defendants. According to Defendants, they responded by pushing his face away with an open hand in order to stop his attempted assault. When he tried to spit again, Defendants pushed his head aside for a second time. Finally, Morabito balled his fists and lunged for Defendants' legs. Defendants pinned him to the ground to prevent his attack. One of them discharged a Taser *near* Morabito's head, warning him that he would use it if he did not calm down. According to Defendants, Morabito was never actually tased but, when it was discharged near Morabito, the distinct electric buzzing sound seemed to frighten him into compliance.[2] After Morabito calmed down, Defendants disengaged and left the cell.

Cleveland Police Internal Affairs conducted an investigation, which yielded conflicting witness accounts. Defendants object to the admissibility of the Internal Affairs report, arguing that it cannot properly be considered, even at the summary judgment stage. Plaintiff does reference the report in her brief, highlighting that one witness stated that Defendants "punched the prisoner, then slammed the prisoner to the ground, and then punched the prisoner again." Another said that Defendants "slapped the prisoner with an open hand and Tasered (Drive Stun) the prisoner while he was pinned down on the ground." Other witnesses supported Defendants' version of the events. The Internal Affairs Unit recommended further review by a prosecutor and the Division of Corrections, but the report's conclusion was that the incident likely occurred as described by Defendants, and therefore the use of force was objectively reasonable.

The district court did not rule on Defendants' evidentiary objections, holding that material issues of fact precluded summary judgment with or without the disputed evidence, and so the evidentiary disputes could be resolved at trial.

Defendants maintain that (1) their conduct was objectively reasonable and did not constitute excessive force, (2) Morabito's need for medical care was not sufficiently serious to support a denial of care claim, and (3) they are immune from all state law claims under Ohio Rev.Code § 2744.03. Plaintiff asserts that the district court correctly denied immunity on all claims and that this court does not have jurisdiction over this interlocutory appeal because Defendants raise factual issues.

## II.

The parties raise a number of preliminary issues to be resolved before turning to the merits of the appeal.

### A. Jurisdiction over Interlocutory Appeal

■ Denial of summary judgment is usually considered an interlocutory order, not a final judgment, and so is ordinarily not appealable. *Bishop v. Hackel*, 636

---

**2.** In support, Defendants offered the expert testimony and report of another officer, who reviewed pictures taken by Plaintiff and testified that Morabito did not exhibit marks on his skin as would be expected had Morabito actually been tased on his neck.

F.3d 757, 764 (6th Cir.2011) (citing *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir.2002)). "However, denial of a motion for summary judgment on the ground of qualified immunity may be deemed a final, appealable order because the qualified immunity doctrine exists partly to protect officials from having to stand trial, and a defendant wrongly forced to go to trial loses the benefit of the immunity even if exonerated after trial." *Id.* Therefore, a district court's denial of qualified immunity on the federal claims is an appealable final decision "'to the extent that it turns on an issue of law.'" *Brown v. Lewis*, 779 F.3d 401, 410–11 (6th Cir.2015) (quoting *Austin v. Redford Twp. Police Dept.*, 690 F.3d 490, 495 (6th Cir.2012)). We have "jurisdiction over the legal question of qualified immunity, *i.e.*, whether a given set of facts violates clearly established law." *Harris v. City of Circleville*, 583 F.3d 356, 364 (6th Cir.2009) (citing *Kirby v. Duva*, 530 F.3d 475, 480–81 (6th Cir.2008)).

Plaintiff contends that Defendants' appeal raises factual issues that we may not resolve in an interlocutory appeal. However, Defendants' ultimate claim, that they are entitled to qualified immunity because Plaintiff has failed to present evidence of excessive force sufficient to raise a material issue of fact, is a reviewable question of law. In addition, the facts surrounding the denial of medical care claim are not in dispute, and therefore denial of qualified immunity on that claim is a pure question of law.

▪ Under Ohio law, our jurisdiction over an interlocutory order denying statutory immunity turns on whether the statute is one that provides immunity from liability (not reviewable) or one that provides immunity from suit (reviewable). *Sabo v. City of Mentor*, 657 F.3d 332, 336 (6th Cir.2011) (citing *Chesher v. Neyer*, 477 F.3d 784, 793 (6th Cir.2007)). "Ohio's immunity statutes were revised in 2003 to provide immunity from suit." *Id.; see also* Ohio Rev.Code § 2744.02(C). Therefore, the district court's denial of immunity under Ohio Rev.Code § 2744 is reviewable.

### B. Standard of Review

We review a district court's denial of summary judgment de novo. *Harris*, 583 F.3d at 364 (citing *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir.1999) (en banc)). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). All factual evidence and all reasonable inferences are construed in favor of the non-moving party. *Harris*, 583 F.3d at 364 (citing *Williams*, 186 F.3d at 689). However, facts alleged that "contradict an unambiguous video recording do not create a triable issue." *Shreve v. Franklin Cnty.*, 743 F.3d 126, 132 (6th Cir.2014) (citing *Scott v. Harris*, 550 U.S. 372, 380–81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)).

### C. Standard of Officer Conduct

The parties disagree about the legal standard against which to measure Defendants' conduct. Plaintiff asserts that an "objectively reasonable" standard applies, while Defendants claim a more lenient standard applies—one which mirrors the Eighth Amendment right to be free from cruel and unusual punishment. *See Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir.2013) ("Which [of the Fourth, Eighth, and Fourteenth Amendments] should be applied in a § 1983 excessive force action depends on the status of the plaintiff at the time of the incident; that is, whether the plaintiff was a free citizen, convicted prisoner, or fit in some gray area between the two."). The standard is important, because a plaintiff's burden is substantially

different depending on the standard applied. *See id.* (citing *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001)). Morabito was neither a free citizen, nor a convicted prisoner, so he fits squarely in the gray area described.

■ Circuits have been divided as to what standard applies, and when, for cases in the "gray area." The Sixth Circuit previously set "the dividing line between the Fourth and Fourteenth Amendment zones of protection at the probable-cause hearing." *Aldini v. Johnson*, 609 F.3d 858, 867 (6th Cir.2010) (footnote omitted). However, the Supreme Court has recently clarified that no dividing line is necessary. Instead, the Court adopted a bright line rule that "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 2473, 192 L.Ed.2d 416 (2015). "Objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Factors to consider include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* (citing *Graham*, 490 U.S. at 396, 109 S.Ct. 1865).

### III.

Qualified immunity for Defendants on the federal use-of-force claim is appropriate unless (1) Defendants violated Morabito's constitutional rights, and (2) at the time of the actions those constitutional rights were clearly established. *See Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir.2015). As noted above, because Morabito was a pretrial detainee Defendants' use of force is to be analyzed to determine whether the force was objectively reasonable. *See Kingsley*, 135 S.Ct. at 2473. "The test is 'reasonableness at the moment' force is used, 'judged from the perspective of a reasonable officer....'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir.2013) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). "[W]e consider not the extent of the injury inflicted but whether an officer subjects a detainee to gratuitous violence." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir.2012) (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir.2010)).

Ohio law does not immunize "acts or omissions [done] with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev.Code § 2744.03(A)(6)(b); *see also Martin*, 712 F.3d at 963. Here, as in *Martin*, "resolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive-force determination under § 1983." 712 F.3d at 963.

■ Plaintiff concedes that Morabito was agitated, and probably was verbally combative, but maintains that Morabito posed no risk to himself or others. Plaintiff describes the incident as Rauscher entering the cell out of frustration, standing over Morabito, threatening and provoking him, eventually striking him twice with an open hand, after which both Defendants slammed Morabito to the floor, where Rauscher tased Morabito's neck and punched him.

Rauscher contends that he was trying to calm Morabito and prevent him from hurting himself. Defendants claim that the

reasonable use of force began in response to Morabito's attempt to spit on Rauscher and escalated when Morabito balled his fists and tried to tackle Rauscher.

The video footage suggests that Rauscher's posture and body language are more confrontational than calming. But, ultimately, despite three camera angles the video evidence is unclear. As soon as the altercation begins, Defendants' bodies almost completely obscure Morabito. While the video footage is consistent with Plaintiff's version of events, it does not contradict Defendants' explanation. For instance, the footage does not show Morabito threatening self-harm, preparing to spit, balling his fists, or attempting to tackle Defendant Rauscher. Nor does it confirm Defendants' contention that use of a Taser was only threatened.

The district court held that summary judgment was inappropriate because material issues of fact exist as to whether Defendants' actions were objectively reasonable (with respect to the federal claim) and were with malicious purpose, in bad faith, or in a wonton or reckless manner (with respect to the state-law claims). Accepting Plaintiff's version of the facts, as we are required to at this stage, provoking an altercation with Morabito out of frustration with his repeated verbal outbursts and demands for medical treatment, ultimately slapping, tasing, and punching Morabito while he was pinned under two officers, does not constitute an objectively reasonable use of force. Further, the constitutional right to be free from such treatment was clearly established long ago.

Finally, that same conduct, if proven, would satisfy the state-law exceptions to immunity under Ohio Rev.Code § 2744.03.

## IV.

The qualified immunity inquiry for the denial of medical care similarly looks to see whether there was a violation of clearly established constitutional rights. Here, though, the inquiry is whether Defendants "acted with 'deliberate indifference to serious medical needs.'" *Harris*, 583 F.3d at 367 (quoting *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir.2009)).

A constitutional claim for deliberate indifference has an objective component which "requires a plaintiff to show the existence of a 'sufficiently serious' medical need." *Id.* at 368. The question is whether "a plaintiff's claims arise from an injury or illness 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir.2004)) (footnote omitted). The claim also requires plaintiff to establish a subjective component—whether defendants "perceived facts from which to infer a substantial risk" to the plaintiff, "did in fact draw the inference," but still "disregarded that risk." *Id.* (citations and quotations omitted).

When, as here, the claim revolves around a *delay* in getting treatment, as opposed to a *denial* of treatment, we generally require "verifying medical evidence in the record establishing the detrimental effect of the delay." *Canady v. Wilkinson*, 90 Fed.Appx. 863, 865 (6th Cir.2004) (citing *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir.2001)).

The evidence in the record, even viewed in the light most favorable to Plaintiff, cannot satisfy the requirements of a denial of medical care claim. Reviewing the video evidence, Morabito is seen to alternatively sit or lie on the floor, occasionally getting up to pace around his cell. Morabito repeatedly asked for medication that he voluntarily stopped taking several days before he was arrested. It would not have been obvious to a layperson (or De-

fendants) that a six-to seven-hour delay in getting this medication would have a detrimental effect, and Plaintiff has provided no evidence to establish there was any detrimental effect from the delay.

Finally, even under Plaintiff's version of the facts, Defendants did not disregard a substantial risk to Morabito, nor did Defendants play any part in delaying Morabito's treatment. When Defendants arrived for their shift, Morabito was already on the schedule to see the jail's medical staff. Presumably, Defendants had the capability to summon emergency medical care, but there is nothing in the record that suggests emergency care was necessary.

A delay of seven hours, especially when the delay was out of the control of Defendants, in cases like these will not support a constitutional claim for denial of medical care. *See, e.g., Santiago v. Ringle*, 734 F.3d 585, 592 (6th Cir.2013) (holding that a two-day delay was insufficient to establish deliberate indifference, and citing cases where no deliberate indifference was found after a sixteen-day delay, a six-day delay, and a three-month delay).

### V.

The judgment of the district court denying qualified immunity as to the denial of medical care claim is **reversed** and **remanded** with instructions to enter summary judgment in favor of Defendants. The judgment of the district court is **affirmed** in all other respects.

BERNICE BOUIE DONALD, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority's decision to affirm the district court's denial of summary judgment on Plaintiff's excessive force claim, but I disagree with the decision to grant the Defendants' motion for summary judgment as it relates to Plaintiff's denial of medical care claim. The majority opinion contends that Defendants enjoy qualified immunity with respect to the medical care claim. There are enough facts in the record to establish an issue of material fact as to whether Defendants were deliberately indifferent toward Morabito's medical needs and, as a result, Morabito suffered detrimental effects.

### I.

Under the Eighth Amendment, prison authorities may be sued for deliberate indifference to the serious medical needs of prisoners, because such indifference constitutes the unnecessary and wanton infliction of pain. *Canady v. Wilkinson*, 90 Fed.Appx. 863, 865 (6th Cir.2004) (citing *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). In order to show a constitutional violation based on an alleged delay in treatment, the prisoner must place verifying medical evidence in the record establishing the detrimental effect of the delay. *Id.* (citing *Napier v. Madison Cnty., Ky.*, 238 F.3d 739, 742 (6th Cir.2001)).

True, in *Canady v. Wilkinson*, we held that a prisoner's claim for denial of medical care failed because the delay was, at best, due to negligence, and because there was no verifying medical evidence in the record that showed a detrimental effect. 90 Fed.Appx. at 865. In *Santiago v. Ringle*, we held that a two-day delay of medical treatment for a severe, painful rash failed to establish deliberate indifference. 734 F.3d 585 (6th Cir.2013).

On first glance, these cases seem to support, as the majority opinion finds, the notion that Morabito's claim also fails to establish deliberate indifference. Upon further review, however, the record shows that Morabito's claim is different. Unlike in the cases the majority cites, the officers

here seemed to have intentionally exacerbated Morabito's medical needs.

There were no acts of excessive force in *Canady* and *Santiago*. In *Canady*, the prisoner suffered from glaucoma and eye related problems that were not exacerbated by anything the officers intentionally caused. *Canady*, 90 Fed.Appx. at 865. In *Santiago*, the prisoner suffered from severe swelling, pain, and skin irritation, but again, this condition was not caused or exacerbated by the officer's intentional actions. *Santiago*, 734 F.3d at 587–88. In the instant case, there are facts demonstrating that Defendants indeed created a greater need for urgent medical care that was intentionally left unattended.

## II.

A qualified immunity inquiry for the delay of medical care centers on whether Defendants acted "with deliberate indifference to serious medical needs." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir.2009). Generally, we review a district court's denial of qualified immunity by concluding whether the officers' conduct satisfies the "standard of objective legal reasonableness." *Estate of Owensby v. Cincinnati*, 414 F.3d 596, 602 (6th Cir. 2005).

Based on the record, a juror could question: (1) whether the delay in Morabito's medical care flowed from the same volitional intent used when Defendants slapped, tased, and punched him; and (2) whether such conduct caused the delay in medical care to be detrimental. In other words, unlike the cases cited above, the delay in medical care here was not an isolated event caused by the officers' negligent refusal to provide medical care, but rather, deliberate actions to exacerbate Morabito's condition.

Morabito started requesting medical care before the physical altercation with

the officers occurred, but according to Plaintiff, he asked for a nurse throughout the night after he was punched twice, tased, and slapped. Presumptively, the deliberate indifference the officers directed toward Morabito when they were beating him up did not end when Morabito continued to ask for medical care. Thus, the excessive force claim is inextricably tied to the denial of medical care claim. If we are to find enough facts supporting a question of excessive force, we also must acknowledge the same facts as they relate to the officers' delay of medical care.

Therefore, the issue does not hinge solely on the time of the delay. Rather, the issue here is a broader one that captures the reality in which the delay occurred: given the excessive force Morabito suffered, was the delay in medical care deliberately indifferent in that it posed a detrimental effect?

First, deliberate indifference has an objective component which requires a plaintiff to show the existence of a sufficiently serious medical need that is so obvious that even a layperson could easily recognize the necessity of immediate medical care. *Harris v. Circleville*, 583 F.3d 356, 368 (6th Cir.2009). Here, Morabito claimed to suffer from Tourette's syndrome, anxiety, bi-polar disorder, depression, insomnia, and obsessive-compulsive disorder. One could question whether a layperson could have inferred, at a minimum, from verbal ticks and outbursts that Morabito had serious medical issues and, thus, known that he required immediate treatment.

Further, deliberate indifference has a subjective component—whether Defendants perceived facts from which to infer that the delay in medical care would pose a substantial risk to Morabito. *Id.* Here, Defendants knew that Morabito had been placed on "suicide watch." According to Defendants, Morabito repeatedly banged

his head against the wall while he was detained. At a minimum, one could reasonably infer that Morabito was not well. Even if Defendants did not know any of Morabito's ailments, they could reasonably infer that after being beaten, tased, slapped, and repeatedly denied medication, he had serious medical needs.

Despite the majority's argument, it is irrelevant that Morabito voluntarily stopped taking his medicine one week before he was detained. More relevant is that, while in custody, during the period of time when Morabito was repeatedly asking for medical care, he was placed on suicide watch, Defendants knew that Morabito had medical needs, but proceeded to harass him and continued to deny him medical care. Thus, when reviewing the facts in the light most favorable to Plaintiff, the record shows that material issues of fact exist as to the officers' denial of medical care that should be resolved by a jury.

For the foregoing reasons, I concur in part and dissent in part.